2008-NMSC-049

190 P.3d 322

Jose PINCHEIRA and Olivia Pincheira,
Plaintiffs–Petitioners,

v.

ALLSTATE INSURANCE COMPANY,
Defendant–Respondent.

No. 30,490.

Supreme Court of New Mexico.

Aug. 5, 2008.

Rehearing Denied Aug. 5, 2008.

Berardinelli Law Firm, David J. Berardinelli, Santa Fe, NM, for Petitioners.

Modrall, Sperling, Roehl, Harris & Sisk, P.A., Lisa Mann, Jennifer A. Noya, Albuquerque, NM, Steptoe & Johnson L.L.P., Bennett Evan Cooper, Jon T. Neumann, Phoeniz, AZ, for Respondent.

Michael B. Browde, Albuquerque, NM, for Amicus Curiae, New Mexico Trial Lawyers Association.

Rodey, Dickason, Sloan, Akin & Robb, P.A., Edward Ricco, Albuquerque, NM, for Amicus Curiae, New Mexico Defense Lawyers Association.

## OPINION

CHÁVEZ, Chief Justice.

{1} On motion for rehearing, the opinion filed June 20, 2008 is withdrawn, and the following opinion is substituted in its place. The motion for rehearing is otherwise denied.

{2} Over seven years ago, Jose and Olivia Pincheira (Plaintiffs) filed a complaint against Allstate Insurance Co. (Defendant) alleging bad faith, fraud, unfair trade practices, and other claims. The merits of those claims are not at issue in this appeal. Rather, this appeal relates to Plaintiffs' attempt to compel discovery of a set of documents known as the "McKinsey slides" or "McKinsey documents." Defendant claimed that these documents contained trade secrets or other confidential or proprietary information and refused to turn them over without a protective order. *See* Rule 1–026(C)(7) NMRA. Following Defendant's refusal to turn over the documents, the trial court entered a default judgment on liability, with damages to be determined at trial. A Court of Appeals majority held that the trial court abused its discretion in ordering Defendant to turn over the documents without either a protective order or an evidentiary hearing, and vacated the default judgment and remanded for reevaluation of Defendant's assertion of a trade secret privilege. *Pin-*

*cheira v. Allstate Ins. Co.* (*Pincheira II*), 2007–NMCA–094, ¶¶ 27, 72, 142 N.M. 283, 164 P.3d 982. The case reaches this Court on Plaintiffs' petition for writ of certiorari.

{3} Although Defendant's request for a protective order has been rendered moot by subsequent events, Plaintiffs' request for sanctions remains. As a result, we take this opportunity to clarify the procedure to be used when seeking to protect an alleged trade secret and the factors that trial courts should consider when issuing protective orders covering trade secrets. We conclude that Defendant met its initial burden of requesting an evidentiary hearing on the trade secret status of its materials by following the procedure we describe. This procedure differs from that proposed by the Court of Appeals, but we affirm the Court of Appeals to the extent that we vacate the default judgment entered against Defendant. On remand, Plaintiffs may request a hearing on the trade secret status of Defendant's documents at the time Defendant refused to turn them over, as potential support for alternative sanctions.

## I. PROCEDURAL BACKGROUND

{4} This case has followed a tortuous path to this Court. The Court of Appeals presented an excellent review of the history in *Pincheira II. See id.* ¶¶ 4–25. We provide a brief overview to clarify the issues on appeal.

{5} Plaintiffs served Defendant with a second request for production of documents on July 16, 2001. Defendant timely responded with numerous objections. With respect to the McKinsey documents, Defendant objected that they contained confidential or proprietary information. Although Defendant did not use the term "trade secret" in its objection, Plaintiffs filed a motion to compel and responded to the objection as if it were an assertion of a trade secret privilege. Defendant's response brief included an affidavit by Allstate corporate vice president Christine Sullivan that explained why Defendant believed the documents to be trade secrets.

{6} Defendant argued the trade secret status of the materials in question at the Octo-

ber 30, 2001,[1] hearing on Plaintiffs' motion, stating that "We said we objected to [discovery] to the extent it sought confidential or proprietary information. We believe that was sufficient to invoke the protection of trade secrets." The trial court accepted the objection as an assertion of trade secrets but ruled that Defendant's affidavit describing the McKinsey documents was "too general and conclusory to support [Defendant's] request" for a protective order.

{7} Before the court entered its order compelling production, Defendant requested an expedited hearing on a motion to reconsider the trial court's oral ruling. In support of that motion, Defendant asked the trial court to hold an evidentiary hearing, as the court had recommended in an earlier case involving the same documents and the same plaintiff's counsel. *See Blanks v. Allstate Ins. Co.*, No. D–101–CV–200000852 (1st Dist. N.M. Oct. 25, 2001). The *Blanks* case was submitted to an arbitrator before the *Blanks* court could hold a hearing. The arbitrator, however, heard testimony about the documents and concluded that they contained trade secrets. Defendant offered the arbitrator's letter in support of its motion and request for an evidentiary hearing in this case.

{8} The trial court denied the request for an evidentiary hearing and ordered Defendant to turn over the documents. Following another hearing, the trial court again ordered Defendant to turn over the documents but granted a temporary protective order pending an appeal for writ of error. The protective order prohibited Plaintiffs from using the documents outside the scope of this litigation and would "remain in effect until fourteen days following the completion of appellate review of the questions presented in [Defendant's] Petition for Writ of Error." At the hearing granting the protective order, the trial court noted that Defendant would "have 14 days to regroup if the Court of Appeals says no or 14 days to respond in some way." The court also noted that, if the Court of Appeals declined to enter a writ of

error, the protective order would be lifted fourteen days later.

{9} Defendant produced the documents and filed its writ of error one day late. *Pincheira v. Allstate Ins. Co.* (*Pincheira I*), 2004–NMCA–030, ¶¶ 3–4, 6, 135 N.M. 220, 86 P.3d 645. The Court of Appeals quashed the writ as untimely. *Id.* ¶ 1. On the same day, the Court of Appeals filed *King v. Allstate Insurance Co.*, which held that an order granting or denying a motion for a protective order cannot be reviewed by writ of error. 2004–NMCA–031, ¶ 1, 135 N.M. 206, 86 P.3d 631. Instead, the Court held that such orders can be appealed only if they are certified by the trial court for an interlocutory appeal or as of right from a contempt citation for failure to comply. *Id.* ¶ 19. We denied Defendant's petition for writ of certiorari from *Pincheira I,* and returned the case to the trial court. *Pincheira v. Allstate Ins. Co.,* 2004–NMCA–030, 135 N.M. 220, 86 P.3d 645.

{10} Before the fourteen-day protective order expired, Defendant asked the trial court to clarify or extend the protective order, and respectfully asked the court to hold it in contempt so that it could appeal as it did in *King*. Plaintiffs returned the documents to Defendant and asked the trial court to enter a default judgment against Defendant for its "contumacious defiance" of the trial court's authority. The trial court ordered Defendant to turn over the documents without a protective order, or it would enter a default judgment. Defendant refused, again asking to be held in contempt. The trial court entered default judgment, with a trial to be held on the issue of damages.

{11} Defendant appealed the default judgment. The Court of Appeals dismissed the appeal, holding that the default judgment was a non-final order because damages had not been decided. *Pincheira II,* 2007–NMCA–094, ¶ 25, 142 N.M. 283, 164 P.3d 982. We granted Defendant's petition for writ of certiorari and remanded to the trial

---

**1.** The motion to compel was not originally scheduled for consideration at this hearing, but both parties agreed to argue the matter. Plaintiffs then presented documentary and live testimony,

which was allowed over Defendant's objection. *Pincheira II,* 2007–NMCA–094, ¶¶ 14–15, 142 N.M. 283, 164 P.3d 982.

court to determine whether the default judgment was intended as a contempt order within the meaning of *King.* The trial court stated that it was.

{12} Defendant timely appealed the contempt order to the Court of Appeals. A Court of Appeals majority remanded to the trial court so that it could vacate the default judgment, reevaluate the documents' trade secret status and, if they were found to be trade secrets, issue an appropriate protective order. 2007–NMCA–094, ¶ 72, 142 N.M. 283, 164 P.3d 982. We granted Plaintiffs' petition for writ of certiorari.

## II. MOOTNESS

{13} Plaintiffs argue that publication of the McKinsey documents on its web site makes this appeal moot and that Defendant should be sanctioned for opposing discovery. *See* Petitioners' Special Motion for Immediate Summary Affirmance ... and for an Award of Attorney Fees and Sanctions, at 6–9, *Pincheira v. Allstate Ins. Co.,* No. 30,490 (N.M. Apr.7, 2008). We agree that Defendant's public disclosure of the McKinsey documents has rendered the request for a protective order moot. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1002, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). "As a general rule, this Court does not decide moot cases." *Gunaji v. Macias,* 2001–NMSC–028, ¶ 9, 130 N.M. 734, 31 P.3d 1008. Plaintiffs, however, continue to ask for sanctions. We cannot determine whether sanctions are warranted unless we first determine whether Defendant was justified in seeking a protective order and then followed the proper procedure for appealing the trial court's denial of a protective order. Therefore, we hold that the appeal is not moot, and we will address the issue of sanctions following our discussion of the merits of this appeal.

## III. TRADE SECRET PRIVILEGE AND PROTECTION

{14} In addition to its complicated and lengthy procedural background, this case requires resolution of the intricate interplay among discovery and privilege rules related to trade secrets. Aside from the two earlier *Pincheira* opinions, we are aware of only two other opinions that dealt with the merits of a trade secret claim, and neither involved the rules of discovery or privilege as they relate to trade secrets. *See Excelsior Laundry Co. v. Diehl,* 32 N.M. 169, 252 P. 991 (1927) (holding that a list of customers on a laundry route is not a trade secret); *Insure N.M., LLC v. McGonigle,* 2000–NMCA–018, 128 N.M. 611, 995 P.2d 1053 (analyzing the definition of trade secrets and the inevitable discovery doctrine under the Uniform Trade Secrets Act, NMSA 1978, §§ 57–3A–1 to –7 (1989)). As such, these are issues of first impression in New Mexico. We review discovery orders for abuse of discretion. *Estate of Romero ex rel. Romero v. City of Santa Fe,* 2006–NMSC–028, ¶ 6, 139 N.M. 671, 137 P.3d 611. Construction of a privilege, however, is a question of law, which we review de novo. *Id.* We begin our analysis with a brief summary of the relevant statutes and rules.

## A. RELEVANT STATUTES AND RULES

{15} New Mexico adopted the Uniform Trade Secrets Act (TSA) in 1989. NMSA 1978, §§ 57–3A–1 to –7 (1989). In doing so, the legislature implicitly recognized the commercial importance of trade secrets and the corresponding need to protect them. *Cf.* Unif. Trade Secrets Act, Prefatory Note (amended 1985), 14 U.L.A. at 531 (2005) (noting "the commercial importance of state trade secret law to interstate business"). The TSA defines a trade secret as

information, including a formula, pattern, compilation, program, device, method, technique or process, that:

(1) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Section 57–3A–2(D). The TSA provides remedies for misappropriation of a trade secret, which means acquiring a trade secret by improper means. *See* § 57–3A–2(A), (B). When an action alleging the misappropriation

of a trade secret is brought under the TSA, the TSA requires the court hearing the case to "preserve the secrecy of [the] alleged trade secret by reasonable means," including protective orders, in camera hearings, and sealing the record. Section 57–3A–6.

{16} We have also adopted rules to protect trade secrets outside of misappropriation complaints. *See* Rules 1–026(C) & 11–508 NMRA. During discovery, the trial court may issue a protective order for trade secrets:

> Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense, including one or more of the following:
>
> . . . .
>
> (7) that a trade secret or other confidential research, development or commercial information not be revealed or be revealed only in a designated way....

Rule 1–026(C).

{17} A party may also assert a trade secret privilege:

> A person has a privilege ... to refuse to disclose and to prevent others from disclosing a trade secret owned by the person, if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice. When disclosure is directed, the court shall take such protective measure [sic] as the interests of the holder of the privilege and of the parties and the furtherance of justice may require.

Rule 11–508.

{18} These rules do not define a trade secret. Although we are not bound by the TSA's definition when construing our own rules, we see no legal or policy reason to adopt an alternative definition. Like the TSA, the discovery and privilege rules are designed to protect the commercial value of trade secrets. Furthermore, following a definition for the TSA and that is different for the rules would create confusion in cases where both the TSA and discovery or privilege are at issue. *Cf. Albuquerque Rape*

*Crisis Ctr. v. Blackmer*, 2005–NMSC–032, ¶ 10, 138 N.M. 398, 120 P.3d 820 (" 'While a statute regulating practice and procedure is not binding on the Supreme Court, it nevertheless is given effect until there is a conflict between the statute and a rule adopted by the Supreme Court.' " (quoting *State v. Herrera*, 92 N.M. 7, 12, 582 P.2d 384, 389 (Ct.App. 1978))).

{19} Before promulgation of the Uniform Trade Secrets Act, most jurisdictions followed Section 757 of the *Restatement (First) of Torts*. *See* Unif. Trade Secrets Act, Prefatory Note, 14 U.L.A. at 531. The *Restatement* defined a trade secret as

> any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

*Restatement (First) of Torts* § 757 cmt. b (1939). The *Restatement* also lists six factors "to be considered in determining whether given information is [a] trade secret":

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* While the TSA's definition of a trade secret is broader than the *Restatement's*, these factors " 'still provide helpful guidance to determine whether the information in a given case constitutes "trade secrets" within the definition of the [TSA].' " *Basic Am., Inc. v. Shatila*, 133 Idaho 726, 992 P.2d 175, 184 (1999) (quoting *Optic Graphics, Inc. v. Agee*, 87 Md.App. 770, 591 A.2d 578, 585 (1991)).

## B.  DISCOVERY VS. PRIVILEGE

{20} Much of the dispute in this case revolves around possible conflicts between Rule 11–508, which creates a trade secret privilege, and Rule 1–026(C)(7), which offers protection for trade secrets.  Both the majority and the dissent in *Pincheira II* refer to the rules as "compatible and complementary," but they disagree about how the standards of proof in the two rules should be applied and whether those standards conflict. *See* 2007–NMCA–094, ¶ 71, 142 N.M. 283, 164 P.3d 982; *id.* ¶ 74 (Vigil, J., dissenting). Plaintiffs would settle this dispute by having us harmonize the two rules.  In contrast, Defendant would have us use the flexibility inherent in Rule 1–026(C) as a means to incorporate provisions of Rule 11–508 into Rule 1–026.

■  {21} We take a different approach, beginning with the recognition that Rule 11–508 is a rule of evidence, whereas Rule 1–026 is a rule of discovery.  The purpose of the rules of evidence is to ascertain the truth by determining what evidence is admissible during the trial. *See State v. Stanley,* 2001–NMSC–037, ¶ 23, 131 N.M. 368, 37 P.3d 85. In contrast, the purpose of our discovery rules is to allow liberal *pretrial* discovery, such that the trial itself is "a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *In re Estrada,* 2006–NMSC–047, ¶¶ 31–32, 140 N.M. 492, 143 P.3d 731 (quoted authority omitted); *see also Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 34, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984) ("Liberal discovery is provided for the sole purpose of assisting in the preparation and trial, or the settlement, of litigated disputes.").

{22} The "broad and flexible" right to discovery allows discovery of information that may not be admissible under the rules of evidence. *United Nuclear Corp. v. General Atomic Co.,* 96 N.M. 155, 170, 629 P.2d 231, 246 (1980) (quoted authority omitted); Rule 1–026(B)(1).  Allowing discovery of privileged information, however, would destroy the privacy right inherent in every privilege, thereby making the evidentiary privilege useless.  As a result, privileged material is not discoverable.  Rule 1–026(B)(1) ("Parties may obtain discovery regarding any matter, *not privileged,* which is relevant to the subject matter involved in the pending action" (emphasis added)).

{23} By referring to privileged material, Rule 1–026(B)(1) incorporates the rules of privilege into the rules of discovery.  It is here, under Rule 1–026(B), where the evidentiary rules of privilege and the rules of discovery intersect.  When a party follows the procedure in Rule 1–026(B)(8) and the trial court finds that information is privileged, the information is not discoverable under the plain language of Rule 1–026(B)(1). *Cf. Wallis v. Smith,* 2001–NMCA–017, ¶ 20, 130 N.M. 214, 22 P.3d 682 ("[O]nce a privilege is asserted in response to interrogatories, counsel cannot unilaterally disregard the privilege and then issue subpoenas to sidestep the procedure outlined in Rule 1–033 [NMRA] for resolving the dispute.").  A protective order should not be necessary unless the party seeking discovery continues to request the information despite the trial court's finding of a privilege.  To avoid delays and multiple proceedings, however, the party opposing discovery may seek a protective order at the same time an objection is raised on the basis of privilege.

{24} To counterbalance the liberality of discovery, Rule 1–026(C) provides additional protection to non-privileged materials, which otherwise are not protected by Rule 1–026(B). *See Seattle Times,* 467 U.S. at 34, 104 S.Ct. 2199.  The purpose of Rule 1–026(C) is not to duplicate the protections offered by Rule 1–026(B), but to give the court an additional mechanism to prevent abuse of discovery. *See Seattle Times,* 467 U.S. at 34–35, 104 S.Ct. 2199.  Thus, Rule 1–026(C) gives the trial court an important supervisory role over the discovery process, allowing the court "to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense." *Id.; Bowlen v. Dist. Court, County of Adams,* 733 P.2d 1179, 1182 (Colo.1987) ("Courts therefore have a substantial role in supervising discovery . . . .").

{25} Public release is an important consideration under Rule 1–026(C).  The federal courts have interpreted the liberal discovery

rules as allowing a party to "generally do what it wants with material obtained through the discovery process, as long as it wants to do something legal." *Harris v. Amoco Prod. Co.,* 768 F.2d 669, 683–84 (5th Cir.1985). In particular, parties may disseminate materials to litigants in other cases or to the public. *Jepson, Inc. v. Makita Elec. Works, Ltd.,* 30 F.3d 854, 858 (7th Cir.1994); *Pub. Citizen v. Liggett Group, Inc.,* 858 F.2d 775, 780 (1st Cir.1988). The right to disseminate, however, may be limited by a protective order issued under Rule 26(c) of the Federal Rules of Civil Procedure. *Seattle Times,* 467 U.S. at 31–36, 104 S.Ct. 2199.

■ {26} Like the federal courts, New Mexico recognizes the right of parties to disseminate discovered materials, subject to the limits of Rule 26(c). *John Does I through III v. Roman Catholic Church of the Archdiocese of Santa Fe, Inc.,* 1996–NMCA–094, ¶ 14, 122 N.M. 307, 924 P.2d 273. While this right receives "*some* [First Amendment] protection," *id.* ¶ 33 (emphasis added), "judicial limitations on a party's ability to disseminate information discovered in advance of trial implicates the First Amendment rights of the restricted party *to a far lesser extent* than would restraints on dissemination of information in a different context." *Seattle Times,* 467 U.S. at 34, 104 S.Ct. 2199 (emphasis added). This authority extends to irrelevant information and information that "if publicly released could be damaging to reputation and privacy," even though it might otherwise be discoverable under Rule 1–026(B). *See Seattle Times,* 467 U.S. at 35, 104 S.Ct. 2199.

{27} In summary, we have a hierarchy of rules governing the disclosure and use of information. The rules of evidence place limitations on the admissibility of certain information during trial. The rules of discovery place limitations on the disclosure and dissemination of a broader range of information that may be obtained during pretrial proceedings. Pretrial limitations may arise out of the evidentiary rules of privilege, or they may arise independently out of the courts' need to prevent abuse of the discovery process.

{28} The Court of Appeals implicitly recognized this hierarchy in *Piña v. Espinoza,* 2001–NMCA–055, 130 N.M. 661, 29 P.3d 1062. In that case, the plaintiff sought to protect communications with her doctor under the physician-patient privilege. *Id.* ¶ 4 (citing Rule 11–504 NMRA). The court held that some of the plaintiff's communications were related to her claim and thus were not privileged under an exception to the physician-patient privilege. *Id.* ¶ 23 (citing Rule 11–504(D)(3)). The court, however, recognized that classifying the communications as non-privileged did "not affect their status as confidential communications." *Id.* ¶ 27. The trial court could therefore issue a protective order under Rule 1–026(C), limiting disclosure only to a party-opponent and preventing disclosure "to the world at large." 2001–NMCA–055, ¶ 27, 130 N.M. 661, 29 P.3d 1062. This solution protected both the court's truth-seeking process and the privilege's purpose of encouraging people in need to seek assistance and to communicate freely with those who can help. *See Albuquerque Rape Crisis Ctr.,* 2005–NMSC–032, ¶¶ 16–18, 138 N.M. 398, 120 P.3d 820.

{29} Like physician-patient communications, trade secrets also receive dual protection from discovery under Rule 1–026(B) and (C). Unlike physician-patient communications, however, trade secrets are mentioned explicitly both in the rules of privilege and the rules of discovery. We now describe how a litigant may seek protection for a trade secret under those rules.

## C. PROCEDURE FOR PROTECTING TRADE SECRETS

{30} As this case has shown, collateral litigation over the protection of trade secrets can drag on for many years, at a high cost to both the courts and the parties, without advancing the ultimate outcome of the case based on its merits. The burden created by this delay should be avoidable because the rules of evidence and discovery, properly applied, create a streamlined process for seeking protection of alleged trade secrets. That is especially true when the case involves only non-competitors and the disputed informa-

tion has not been offered for admission at trial.

## 1. INITIAL ASSERTION OF A TRADE SECRET

{31} Two avenues are available to a party seeking to protect a trade secret: establishing a privilege or obtaining a protective order. Establishing a privilege requires a showing that the information comprises a trade secret and that the privilege "will not tend to conceal fraud or otherwise work injustice." Rule 11–508. Obtaining a protective order requires a showing that the information comprises a trade secret and that there is "good cause" to issue the order. Rule 1–026(C). Common to both rules is the requirement to show that the information comprises a trade secret.

{32} Given this common first step, we see no reason to distinguish between assertion of a privilege or a request for a protective order during the early stages of litigation. In either situation, the party opposing discovery or production must first make a good faith claim that the materials it seeks to protect comprise trade secrets. Plaintiffs argue that this claim should be made following the exact procedure set out in *Piña*, which requires submission of a privilege log and supplemental affidavits that "fully set out the basis for the claim." *Piña*, 2001–NMCA–055, ¶¶ 24–25, 130 N.M. 661, 29 P.3d 1062. That argument, however, ignores the difference between trade secrets and other types of information or communications.

{33} *Piña* involved questions of physician-patient privileges that, like other communication privileges, are destroyed by any revelation of the actual communications. The purpose for requiring detailed privilege logs and affidavits is to give the demanding party "a fair opportunity to argue against the privilege claim" without destroying the privilege in the process. 2 Paul R. Rice, *Attorney–Client Privilege in the United States* § 11:6, at 63–64 (2d ed. 1999) (footnote omitted). A

court may alternatively require a less-detailed description and determine privilege through an in camera examination, but this deprives the opponent of the opportunity to test the claim in an adversarial proceeding. *Id.* at 68; *Piña*, 2001–NMCA–055, ¶ 20, 130 N.M. 661, 29 P.3d 1062.

{34} Adversarial proceedings are particularly important when a trade secret is asserted. "The existence of a trade secret ordinarily is a question of fact." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir.2003) (footnote omitted). It is also "one of the most elusive and difficult concepts in the law to define." *Id.* (quoted authority omitted). Evaluating trade secret status therefore "requires an ad hoc evaluation of all the surrounding circumstances. For this reason, the question of whether certain information constitutes a trade secret ordinarily is best resolved by a fact finder after full presentation of evidence from each side." *Id.* (quoted authority omitted). When the trade secret is claimed in the context of a privilege or discovery order, it is evaluated as a preliminary question of fact by the trial court under Rule 11–104(A) NMRA. *See* 26 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5652, at 396 (1992).

■ {35} Detailed privilege logs or in camera hearings are unnecessary for these proceedings when, as here, the claim involves trade secrets and the opposing party is not a competitor. When those conditions exist, and the party opposing discovery or production makes a good faith claim of a trade secret, the trial court should readily order production of the information on the conditions that it be used solely for the purpose of determining trade secret status and that it not be disseminated to anyone other than the parties.[2] If the parties cannot agree on the trade secret status of the information, the trial court should then hold a closed, adversarial hearing in which it determines the

---

**2.** We recognize that this process may not work when the litigation involves competitors, because disclosure under a protective order will not preserve the trade secret. In those cases, the trial court may need to modify the process by allowing disclosure to counsel only, holding an in camera hearing, appointing an expert or special discovery master, following a process more strictly aligned with *Piña*, or other similar measures. *See* Rule 11–706 NMRA (court-appointed experts); Rule 1–053 NMRA (special masters).

trade secret status of the materials. This initial procedure should be the same, whether the opposing party asserts a privilege under Rules 11–508 and 1–026(B)(8), or seeks a protective order under Rule 1–026(C)(7).

{36} This process minimizes the burden for both the parties and the courts. It avoids collateral disputes over whether the privilege log is sufficiently detailed, and it allows the opposing party to test the claim with the actual information rather than a description of the information. It also postpones the need to show no injustice, which will be unnecessary if the court finds that the information is not a trade secret.

{37} If the hearing is held in the context of a Rule 1–026(C)(7) protective order, this process may also eliminate the need for the court to review thousands of pages or documents. A collection of pages or documents may comprise a trade secret, even though the individual pages or documents, by themselves, are not trade secrets. *Imperial Chem. Indus. Ltd. v. Nat'l Distillers & Chem. Corp.*, 342 F.2d 737, 742 (2d Cir.1965); *State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 80 Ohio St.3d 513, 687 N.E.2d 661, 674–75 (1997). A relatively cursory review may be sufficient to show that the collection as a whole comprises a trade secret. Reviewing each page individually, or even compiling a privilege log listing every page, would therefore be a waste of time. If the party compelling discovery later seeks to admit individual pages into evidence, the court can review only those pages when the request is made. *See Tavoulareas v. Piro*, 93 F.R.D. 24, 29–30 (D.C.D.C.1981) (granting protective order based on a "relatively cursory review of the contents or source of the documents" and allowing challenges to specific documents in order to expedite discovery and minimize involvement of the court (footnote omitted)). The trial court may want to establish, as part of its protective

order, a procedure to challenge the trade secret status of individual portions of the collection. *See Baker v. Liggett Group, Inc.*, 132 F.R.D. 123, 126 (D.Mass.1990).

{38} Favoring production upon a good faith showing does not limit the trial court's discretion. If the party opposing production gives nothing more than "an initial conclusory assertion" of a trade secret's existence, the trial court may decline further review and order production without a protective order. *See Piña*, 2001–NMCA–055, ¶ 25, 130 N.M. 661, 29 P.3d 1062. But given the elusive nature of trade secrets, it may not be possible to "fully set out the basis for the claim" without actually producing the documents under a protective order for review by both the opposing party and the court. *See id.* In deciding whether the initial assertion of a trade secret is sufficient, the trial court should consider both the nature of the information and how easily it can be made available under a protective order.

{39} If the trial court determines, or the parties agree, that the contested information does not comprise a trade secret, the initial protective order should be lifted and full disclosure ordered. The holder of the information may then seek to protect the information as " 'other confidential research, development or commercial information.' " *Pincheira II*, 2007–NMCA–094, ¶ 57, 142 N.M. 283, 164 P.3d 982 (quoting Rule 1–026(C)(7)) However, if the conclusion is that the information does comprise a trade secret, the court should craft an appropriate protective order covering use and dissemination of the information (including, possibly, post-trial dissemination). We agree that the requirement to show "good cause" under Rule 1–026(C) is met by the establishment of a trade secret, which by definition implies that unprotected disclosure results in economic harm.[3] *See Pincheira II*, 2007–

---

3. This does not change the standard for showing good cause when the party claims protection for "other confidential research, development or commercial information" under Rule 1–026(C)(7), as established in *Krahling v. Executive Life Ins. Co.*, 1998–NMCA–071, 125 N.M. 228, 959 P.2d 562. In *Krahling*, the Court of Appeals held that good cause requires a specific showing that "disclosure will work a clearly defined and

serious injury to the party seeking closure." *Id.* ¶ 15 (quoted authority omitted). This holding did not apply to trade secrets, because the court specifically noted that the materials under dispute did not contain trade secrets. *Id.* ¶¶ 10 n. 2, 17. While the Court of Appeals' opinion in *Pincheira II* agreed with this analysis of *Krahling*, the opinion mistakenly put the burden to show an injury on the party seeking disclosure, rather

NMCA–094, ¶¶ 46–47, 142 N.M. 283, 164 P.3d 982; *accord Wauchop v. Domino's Pizza, Inc.*, 138 F.R.D. 539, 546 (N.D.Ind.1991) ("A showing that a discovery request seeks trade secrets constitutes an adequate demonstration of good cause for a protective order under Rule 26(c)."). Once this protective order is entered, the trial court should not have to concern itself with the material again unless and until the compelling party seeks to admit it at trial.

## 2. ESTABLISHING A TRADE SECRET PRIVILEGE

{40} Once the trial court determines that information comprises a trade secret, the information is privileged. A trade secret, however, can survive limited disclosure, unlike other privileged information such as physician-patient communications. Thus, the trade secret privilege is qualified[4] rather than absolute, permitting admission at trial "if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice." Rule 11–508. Even if the information is admitted, "the court shall take such protective measure [sic] as the interests of the holder of the privilege and of the parties and the furtherance of justice may require." *Id.*

{41} Because the trade secret privilege survives disclosure as a qualified privilege, the Rule 1–026(B)(1) blanket prohibition against discovery of privileged material would appear to prohibit any discovery of trade secrets. This runs contrary to Rule 11–508's purpose in allowing the admission of such materials. Because Rule 1–026(B) incorporates the rules of privilege, it must be read *in pari materia* with Rule 11–508, *see State v. Stephen F.*, 2006–NMSC–030, ¶ 17, 140 N.M. 24, 139 P.3d 184, and we construe the rules "in a way that facilitates their operation and the achievement of their goals." *Miller v. N.M. Dep't of Transp.*, 106 N.M. 253, 255, 741 P.2d 1374, 1376 (1987), *superseded by statute on other grounds as recognized in Gallegos v. Sch. Dist. of W. Las Vegas*, 115 N.M. 779, 782, 858 P.2d 867, 870 (Ct.App.1993) (Hartz, J., concurring). We avoid any conflict by incorporating the evidentiary definition of privilege into Rule 1–026, thereby prohibiting discovery only to the extent that the privileged material is not admissible.

{42} The party seeking admission of a trade secret has the burden of showing fraud or injustice. To put the burden on the party opposing admission would require proof of a negative, which is a difficult burden and one that could be unrealistic in some situations. *See, e.g., Vieth v. Jubelirer*, 541 U.S. 267, 311, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (Kennedy, J., concurring) ("[P]roving a negative is a challenge in any context."); *Berry v. Fed. Kemper Life Assurance Co.*, 2004–NMCA–116, ¶ 75, 136 N.M. 454, 99 P.3d 1166. *But see Dawley v. La Puerta Architectural Antiques, Inc.*, 2003–NMCA–029, ¶ 23, 133 N.M. 389, 62 P.3d 1271 ("We are mindful that it is the plaintiff's burden to demonstrate lack of probable cause notwithstanding the obstacles inherent in proving a negative proposition."). This is similar to the burden we place on the discovery of work product, where the party seeking to compel production must prove that denial of production will result in unfair prejudice or cause undue hardship or injustice. *Knight v. Presbyterian Hosp. Ctr.*, 98 N.M. 523, 525, 650 P.2d 45, 47 (Ct.App.1982); *Carter v. Burn Constr. Co.*, 85 N.M. 27, 31, 508 P.2d 1324, 1328 (Ct.App.1973)

{43} As with the initial proof of a trade secret, proof of fraud or injustice requires a review of the particular facts and circumstances of the case.[5] When, as here, the case

---

than on the party seeking closure. *Compare Pincheira II*, 2007–NMCA–094, ¶ 46, 142 N.M. 283, 164 P.3d 982 *with Krahling*, 1998–NMCA–071, ¶ 15, 125 N.M. 228, 959 P.2d 562.

**4.** A "qualified" privilege allows disclosure under limited conditions, whereas a "conditional" or "contingent" privilege is an absolute privilege that is destroyed when certain conditions are met. *Cf. Pincheira II*, 2007–NMCA–094, ¶ 67, 142 N.M. 283, 164 P.3d 982 (referring to the

trade secret privilege as "conditional"); *id.* ¶ 74 (Vigil, J., dissenting) (referring to the trade secret privilege as "contingent").

**5.** Because the burden to prove fraud or injustice does not arise until evidence is sought to be admitted, we are not faced with circumstances that require us to define that burden. Nevertheless, we agree with the Court of Appeals that analysis of the trade secret privilege in other jurisdictions provides guidance for defining this

does not involve competitors, the party seeking admission should have full access to the contested information when making its argument. If, however, access is limited based on the competitive stance of the parties, the trial court should consider the added difficulty created by the limited access in establishing fraud or injustice.

{44} An assertion of a trade secret privilege may be made contemporaneously with or at any time after the initial claim that certain information comprises a trade secret. When the quantity of information is small, and it is anticipated that it will be used at trial, it may be most efficient to assert the privilege at the same time the initial protective order is sought. When the information is voluminous, and it is not clear which portions, if any, will be used at trial, it may be most efficient to postpone the privilege claim until the parties have limited the scope of the material they will use at trial. To maintain flexibility in timing, the privilege is not waived if a party initially seeks a protective order only on the basis of Rule 1–026(C)(7), so long as the request specifically claims trade secret status.

### 3. SUMMARY AND APPLICATION TO THIS CASE

{45} The procedure we have described today should streamline the process for protecting trade secrets, minimizing the burdens on all parties and the court, and protecting economic interests, without compromising the court's interest in ascertaining the truth. While this procedure may appear to depart from earlier decisions related to privilege, such a conclusion ignores the unique nature of trade secrets and the fact that we have never addressed trade secrets in the context of protective orders or privilege.

{46} The process for protecting a trade secret is initiated when one party makes a discovery request or seeks to admit evidence, and the opposing party responds with a good faith assertion that the information is a trade secret. Unless the compelling party seeks admission at this time, the opposing party need not assert a privilege. burden. *See Pincheira II*, 2007–NMCA–094,

{47} If the parties are not competitors, the trial court should issue an appropriate protective order and hold an evidentiary, adversarial hearing on the trade secret status of the information. If the court finds that the information is not a trade secret, it cannot be protected unless it is confidential information. If the information is a trade secret, the trial court should issue an appropriate protective order covering both pretrial proceedings and post-trial dissemination.

{48} It is only when the compelling party seeks to admit the information that the opposing party must assert a trade secret privilege. At that time, the compelling party must identify what subset of the information it seeks to admit. If the trial court determines that the information standing on its own is a trade secret, the compelling party must then show why preventing admission would conceal a fraud or work injustice. If this burden is met, the trial court should allow the material to be admitted, but it should also craft an appropriate protective order covering use and dissemination of the information during and after the trial proceedings.

{49} In this case, the record shows that Defendant made a good faith claim that the information it sought could be a trade secret, justifying an evidentiary hearing on the trade secret status of the McKinsey documents. *See Pincheira II*, 2007–NMCA–094, ¶ 52, 142 N.M. 283, 164 P.3d 982. The affidavit describes the type of information contained in the document, how Defendant uses that information in its business, how the information would be useful to competitors, and how Defendant kept the information secret.

{50} More significantly, the arbitration letter submitted by Defendant states that the McKinsey documents "contain[ ] trade secret information subject to protection." Although the arbitrator heard testimony about the documents, he acknowledged that "the [p]laintiff's witnesses did not actually know the contents of the documents" and recognized that he might need to reconsider his findings

¶¶ 39–41, 142 N.M. 283, 164 P.3d 982.

if the plaintiffs later acquired new information. This situation illustrates the difficulty inherent in defending against a privilege claim without access to the allegedly privileged materials.

{51} Because Defendant met its initial burden of making a good faith claim of a trade secret, the trial court's denial of Defendant's request for a protective order and evidentiary hearing was an abuse of discretion. In asking to be held in contempt, Defendant followed the procedure approved by the Court of Appeals in *King. See* 2004–NMCA–031, ¶ 19, 135 N.M. 206, 86 P.3d 631. Although the threat of a contempt sanction serves the useful purpose of discouraging the appeal of unimportant issues, sanctions are inappropriate when the appellant prevails. *See id.* ¶ 18. The default judgment entered against Defendant is therefore reversed and the case remanded.

### D. TRADE SECRET ANALYSIS AND ALTERNATIVE SANCTIONS

{52} Although Defendant met its initial burden justifying an evidentiary hearing, the trial court may have determined, after a hearing on the trade secret status of the materials, that Defendant lacked a good faith basis for asserting trade secret protection. Such a finding may have been warranted if the Sullivan affidavit turned out to be false or misleading, or if Defendant knew that the McKinsey documents had lost their trade secret status since the arbitrator's finding. Plaintiffs may therefore move for sanctions on remand, which will require a hearing on the trade secret status of the materials at the time Defendant made its original request for a protective order. The trial court may consider the following non-exclusive factors in its analysis.

### 1. VALUE OF INFORMATION

{53} Economic value is one of the defining characteristics of a trade secret. *See* § 57–3A–2(D)(1). Placing a value on trade secrets is a difficult task, even after the information has been misappropriated and used by a competitor. *See* Douglas G. Smith, *Application of Patent Law Damages Analysis to Trade Secret Misappropriation Claims,* 25 Seattle U.L.Rev. 821, 823 (2003) ("Trade secrets often relate to some small part of a process or machine and, by their very existence as 'secrets,' may not be as readily subject to valuation in the marketplace."). Uncertainty about the *computation* of value, however, does not mean there must be uncertainty as to the *fact* of value. *Cf. Nosker v. W. Farm Bureau Mut. Ins. Co.,* 81 N.M. 300, 302, 466 P.2d 866, 868 (1970) ("Our law is to the effect that lack of certainty of proof of damage, which will prevent a recovery, is uncertainty as to the fact of the damage, and not as to its amount.").

{54} In determining whether a trade secret exists, we are concerned only with the fact of the information's value, not the computation of that value. The value does not need to be large, only "more than trivial," and it can be shown by circumstantial evidence such as the amount of resources invested in development of the information, efforts to protect its secrecy, and its use in the business. *Restatement (Third) of Unfair Competition* § 39 cmt. e (1995).

{55} Plaintiffs claim that the Sullivan affidavit is too general to meet Defendant's initial burden, in part because Defendant "has the burden to show that disclosure ... would cause a *specific,* significant harm to its competitive and financial position" through the production of concrete examples. If this were a misappropriation case where Defendant sought damages, we would agree with Plaintiffs. However, Defendant is only trying to establish the existence of a trade secret. Under those circumstances, the Sullivan affidavit adequately describes the efforts Defendant took to develop the information, the efforts it took to keep the information secret, how the information is used in its business, and how competitors might use the information. The Sullivan affidavit and the arbitrator's letter are what justified an evidentiary hearing on the trade secret status of the McKinsey documents. On remand, any analysis of value should focus on whether the documents retained more than a trivial value when Plaintiffs sought to compel production.

**614**

## 2. AGE OF INFORMATION

{56} The Court of Appeals noted that the age of information is a factor in determining its status as a trade secret. *Pincheira II,* 2007–NMCA–094, ¶ 52, 142 N.M. 283, 164 P.3d 982. There appeared to be some confusion over the proper application of this factor during oral argument and in the proceedings before the trial court. While age is a relevant factor, its significance is limited.

■■■ {57} First, we note that the three-year statute of limitations in the TSA has nothing to do with whether information has lost its trade secret status because of its age. *See* § 57–3A–7. Information can remain a trade secret for much longer than three years. *See, e.g., Coca–Cola Bottling Co. of Shreveport, Inc. v. Coca–Cola Co.,* 107 F.R.D. 288, 294 (D.Del.1985) (describing how the formula for Coca–Cola has been kept as a trade secret since 1886). The purpose of the statute of limitations is not to set a maximum age on a trade secret, but to "compel the exercise of a right of action within a reasonable time so that the party against whom the action is brought will have a fair opportunity to defend." *Moncor Trust Co. ex rel. Flynn v. Feil,* 105 N.M. 444, 446, 733 P.2d 1327, 1329 (Ct.App.1987).

{58} Second, age alone can never destroy a trade secret. Information remains a trade secret so long as it is kept secret and retains value to both the holder and its competitors. *Brittain v. Stroh Brewery Co.,* 136 F.R.D. 408, 415 (M.D.N.C.1991). When the information "encompasses strategies, techniques, goals and plans" that may change over time, the information remains valuable to the extent that it "still reflects current thinking." *See id.* at 415–16. Even if the information no longer reflects current thinking, a competitor could, for example, use old business data to extrapolate a business's current strategy. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 529 F.Supp. 866, 891–92 (E.D.Pa. 1981). Age therefore indicates a need for greater scrutiny, but otherwise does not limit information's status as a trade secret. *See Brittain,* 136 F.R.D. at 415.

{59} The events in this case illustrate the relationship between age and value. Despite its public release of the McKinsey documents, Defendant claims that they were still valuable as trade secrets. *See* Notice of Intention to Produce, at 1. Defendant concluded, however, that the information's value had been outweighed by the cost of keeping the documents secret in the form of negative publicity. *See id.* at 2. Therefore, Defendant does not contend that the passage of time reduced the documents' value, but rather the loss in value resulted from other events that happened during that time. On remand, any analysis of age should consider only the events that transpired between the creation of the McKinsey documents and Plaintiffs' motion to compel production.

## 3. PUBLIC INFORMATION

■■■ {60} Information that is publicly available cannot, by definition, be a trade secret. As we have already noted, however, a collection of pages or documents may comprise a trade secret, even though the individual pages or documents, by themselves, are not trade secrets. This may be true even if the individual pages are publicly available. *Imperial Chem. Indus.,* 342 F.2d at 742 ("[A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret."); *Plain Dealer,* 687 N.E.2d at 674–75 ("Where documents already in the public domain are combined to form a larger document, a trade secret may exist if the unified result would afford a party a competitive advantage.").

{61} Plaintiffs claim that the McKinsey documents could not have been trade secrets because they contain information that was publicly available in Defendant's Claims Core Process Redesign (CCPR) manuals. As *Imperial Chemical Industries* and *Plain Dealer* show, however, the *collection* of McKinsey slides can be a trade secret, even though the information on individual slides may be in the public domain. Whether the publicly-available portions of the documents were sufficient to destroy the trade secret is a factual question for the trial court.

{62} Plaintiffs also claim that the McKinsey documents could not have been trade secrets after the protective order expired because they were under no obligation to keep the materials secret, and Plaintiffs' counsel, Mr. Berardinelli, published an article about the documents, attached his summary notes of the slides into the record proper, and may have planned to publish a book about the documents, as alleged by Defendants. Whether these public revelations actually contained trade secrets or disclosed enough of the trade secrets so as to diminish their value is a factual question.

## 4. NEGATIVE INFORMATION

{63} Defendant has argued that the McKinsey documents were trade secrets in part because they show business methods that Defendant considered and rejected, and that competitors could use that information in developing their own processes. Other jurisdictions have recognized this type of "negative knowledge" as a trade secret. *See On–Line Techs., Inc. v. Perkin–Elmer Corp.,* 253 F.Supp.2d 313, 323 (D.Conn.2003) (applying Connecticut Uniform Trade Secrets Act); *Novell Inc. v. Timpanogos Research Group Inc.,* 46 U.S.P.Q.2d 1197, 1217 (Utah Dist.Ct. 1998) ("[N]egative knowledge gives [former employees] a considerable head start or competitive advantage as they develop competing products for the market.").

{64} In response, Plaintiffs argue that, because the public CCPR manuals describe what processes work, a "reasonably competent competitor ... would automatically know what ... didn't work." This argument is based on three false assumptions. First, it assumes that the competitor will independently think of every alternative that Defendant considered, and thus not gain any new information from Defendant's documents. Second, it assumes that the competitor has already thought of those alternatives, and thus will not save any time by seeing them in Defendant's documents. Third, it assumes that Defendant was correct in rejecting each of the alternatives, and that the competitor would not identify any flaws in Defendant's methodology as revealed in the documents. On remand, any analysis of value should include the value of the McKinsey documents as negative information.

## E. PROTECTIVE ORDERS

{65} The procedure we have described today relies in part on the fact that the value of a trade secret can be preserved, even if the secret is disclosed, as long as disclosure is limited by an appropriate protective order. Although the need for a protective order has been rendered moot in this case, the trial court's ability to fashion an appropriate order is necessary to our holding. We therefore provide guidance for future protective orders. The specific terms of the actual orders remain within the trial court's discretion and will depend on the circumstances of each case.

## 1. GENERAL GUIDELINES

{66} The purpose of a protective order is to maintain a trade secret's value, while giving the opposing party access to the information it needs to fairly prepare for and present its case. The trial court may consider a number of factors in crafting a protective order. The list we present here is not exclusive.

{67} The wider the dissemination of the information at issue, the more likely it is that the trade secret will be compromised. The protective order should therefore limit dissemination of the material to the parties and their counsel for use in the case before the court, subject to the discovery-sharing guidelines discussed below. *See, e.g., In re Remington Arms Co.,* 952 F.2d 1029, 1033 (8th Cir.1991). The trial court may consider whether reproduction of the materials should be limited or prohibited, whether the materials should be marked as confidential or trade secrets, whether the materials and all copies should be returned to the originating party upon completion of the litigation, and whether the compelling party should post a bond. *See, e.g., id.; Wauchop,* 138 F.R.D. at 553; *Baker,* 132 F.R.D. at 129.

{68} The trial court may also consider whether a protective order will be effective, even if the party compelling discovery can show that disclosure is otherwise warranted. In *Remington Arms,* for example, the appel-

late court noted that the counsel who sought to compel discovery of alleged trade secrets may have made unauthorized disclosures of other trade secrets in cases involving the same defendant, even though such actions would have subjected him to sanctions. 952 F.2d at 1033. Under these circumstances, the trial court has the discretion to decline to order production of the material, even with a protective order. *See id.*

{69} These guidelines apply to all of the protective orders discussed in this opinion, including the initial protective order issued to hold a hearing on trade secret status, and any subsequent orders issued covering discovery, trial, and post-trial phases of the litigation. Given the potential value of trade secrets, protective orders should expire only upon an affirmative order of the trial court. *See, e.g., Baker,* 132 F.R.D. at 129. This precaution will avoid the confusion that was caused by the automatic expiration provision of the protective order in this case.

## 2. DISCOVERY SHARING

{70} The parties and amici recognize that this case is really about discovery sharing, both with other litigants and with the public at large. *See Pincheira II,* 2007–NMCA–094, ¶ 59, 142 N.M. 283, 164 P.3d 982.

{71} Plaintiffs claim that protective orders increase the cost of litigation by allowing Defendant to relitigate the same issue with other plaintiffs. A protective order prohibiting discovery sharing can "make other litigation more difficult, costly and less efficient." *Cipollone v. Liggett Group, Inc.,* 113 F.R.D. 86, 87 (D.N.J.1986). Costs are increased for the courts, the other litigants, and even the party opposing discovery. *See Ward v. Ford Motor Co.,* 93 F.R.D. 579, 580 (D.Colo.1982). As a result, courts favor the "[c]ollaborative use of discovery material" to "further the goals of Rule 1 [of the Federal Rules of Civil Procedure; Rule 11–102 NMRA] by eliminating the time and expense involved in 'rediscovery'." *Wauchop,* 138 F.R.D. at 546.

{72} Despite these benefits, insistence upon unlimited dissemination would take away the trial court's discretion to consider the potential abuses of discovery sharing

when crafting its protective order. *See Wilk v. Am. Med. Ass'n,* 635 F.2d 1295, 1299 (7th Cir.1981). If a litigant wishes to share discovery, the parties should first try to reach an agreement on their own, consistent with the protective order. Ordinarily a protective order should permit discovery sharing among other litigants and witnesses, who are not competitors of the defendant, and who sign an agreement subjecting themselves to the terms of the protective order. If they cannot agree, then the parties may move the court to resolve their dispute. *See Cipollone,* 113 F.R.D. at 91 (requiring parties or collateral litigants who wish to share discovery to "seek leave of the court before whom the matter is pending."); *see also, e.g., Wauchop,* 138 F.R.D. at 554; *Baker,* 132 F.R.D. at 126; *In re Upjohn Co. Antibiotic Cleocin Prods. Liab. Litig.,* 81 F.R.D. 482, 485 (E.D.Mich. 1979). This action will allow the trial court to determine, on the particulars of each discovery-sharing request, whether the other litigants can be covered by the existing protective order or a modified protective order, or whether sharing with a particular litigant should be prohibited. *See Bittaker v. Woodford,* 331 F.3d 715, 726 (9th Cir.2003) ("Courts could not function effectively in cases involving sensitive information ... if they lacked the power to limit the use parties could make of sensitive information obtained from the opposing party by invoking the court's authority.").

{73} The procedure we describe today, coupled with the guidelines for protective orders, gives trial courts the discretion they need to efficiently move cases along and to allow discovery sharing, where appropriate. By making it easier for parties to obtain an adversarial, evidentiary hearing on information's trade secret status, we also hope to preclude at least some relitigation of discovery matters.

## IV. CONCLUSION

{74} Defendant met its initial burden of asserting a trade secret, justifying an evidentiary hearing on the trade secret status of the McKinsey documents. The trial court therefore abused its discretion in denying Defendant's request for a hearing. That re-

quest, however, has been rendered moot. We remand to the trial court to reverse its entry of default judgment and to continue this case on its merits. Plaintiffs may request an evidentiary hearing to establish the trade secret status of the disputed materials at the time Defendant first opposed discovery, to determine whether sanctions are warranted consistent with this opinion.

{75} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA, PETRA JIMENEZ MAES, and RICHARD C. BOSSON, Justices, and RODERICK T. KENNEDY, Judge, Sitting by Designation.