**Certiorari Granted, February 18, 2019, No. S-1-SC-37420**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2019-NMCA-012**

**Filing Date: November 13, 2018**

**Docket No. A-1-CA-35864**

**ALBUQUERQUE JOURNAL and
KOB-TV, LLC,**

  **Plaintiffs-Appellees,**

**v.**

**BOARD OF EDUCATION OF
ALBUQUERQUE PUBLIC SCHOOLS,
and RIGO CHAVEZ, in his capacity as
custodian of records of Board of
Education for Albuquerque Public Schools,**

  **Defendants,**

**and**

**MAUREEN SANDERS,**

  **Witness-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Nancy J. Franchini, District Judge**

Peifer, Hanson & Mullins, P.A.
Charles R. Peifer
Gregory P. Williams
Albuquerque, NM

for Appellee Albuquerque Journal

Foster Rieder & Jackson, P.C.
Geoffrey D. Rieder
Albuquerque, NM

for Appellee KOB-TV, LLC

Ortiz & Zamora, Attorneys at Law, LLC
Tony F. Ortiz
Santa Fe, NM

for Defendants

Sanders & Westbrook, PC
Maureen A. Sanders
Albuquerque, NM
Witness-Appellant
Brant & Hunt, Attorneys
John M. Brant
Albuquerque, NM

for Witness-Appellant

**OPINION**

**HANISEE, Judge.**

**{1}** Non-party Appellant Maureen Sanders appeals the district court's discovery order requiring her to answer Plaintiffs' deposition questions regarding, and to produce notes she took during, conversations that she claims are privileged under either the Open Meetings Act (OMA), NMSA 1978 §§ 10-15-1 to -4 (1974, as amended through 2013), or Rule 11-503(B)(3) NMRA's attorney-client privilege. Concluding that the district court (1) properly determined that there exists no OMA privilege in New Mexico, and (2) did not abuse its discretion in determining that Sanders failed to meet her burden of establishing the applicability of the attorney-client privilege, we affirm.

**BACKGROUND**

**The Historical Facts Underpinning the Underlying Case**

**{2}** The underlying case between two media outlets—the Albuquerque Journal and KOB-TV, LLC (collectively, Plaintiffs)—and the Albuquerque Public Schools (APS) Board of Education (the Board) and APS's records custodian Rigo Chavez (collectively, Defendants) is an enforcement action under the New Mexico Inspection of Public Records Act (IPRA), NMSA 1978, §§ 14-2-1 to -12 (1947, as amended through 2018) (the IPRA action). In the IPRA action, Plaintiffs seek to enforce their right to inspect public records that Defendants have withheld from inspection based on claims that those records are exempt from inspection.

**{3}** The IPRA action was borne of the events surrounding and immediately preceding the abrupt resignation of Winston Brooks from his position as APS Superintendent on August 15, 2014—just two days after the start of the 2014-2015 school year—and the

$350,000 buyout of Brooks' contract that the Board approved as part of Brooks' Resignation and Settlement Agreement (the Settlement Agreement). On August 11, 2014, the Board met in a closed session to discuss a report prepared by attorney Agnes Padilla (the Padilla Report, or Report) at the request of Board President Analee Maestas. The Report was commissioned after Maestas and Board member Martin Esquivel became aware of "misconduct allegations involving [Brooks]" and what they later described as the possibility of litigation against APS resulting therefrom. The closed meeting was convened for the purpose of "discuss[ing] a limited personnel matter regarding [Brooks'] performance, evaluation, improvement plan, reports or concerns received by the president of the [B]oard or [members of the] Board of Education related to [Brooks], [Brooks'] contract, and possible disciplinary action."

{4}      During the closed meeting, Brooks and his attorney Maureen Sanders waited in a room separate from where the Board was meeting with its attorney, Tony Ortiz. More than once during the closed meeting, Ortiz left the Board to speak with Brooks and Sanders. Four days later, the Board and Brooks entered into the Settlement Agreement. Included as part of the Settlement Agreement was a reference letter for Brooks signed by Maestas and containing a positive review of Brooks' tenure as APS Superintendent, noting the Board's appreciation for his service, and "wish[ing] him well in his future endeavors." The Settlement Agreement provided that APS "will maintain [the] reference letter for Brooks in his personnel file" and "[i]f contacted by anyone seeking references for Brooks . . . [the letter] will be the only official reference provided by [APS]." It further provided that APS "shall maintain . . . the [Padilla R]eport . . . in a file separate from Brooks' personnel file, and it shall not be released to anyone, including potential future employers in response to a request for Brooks' personnel file." The Settlement Agreement contained no discussion of the reasons underlying the decision to prematurely terminate Brooks' contract with APS and provided only that "[n]othing in this [a]greement or in its execution admits wrongdoing of any kind by either party" and that the agreement was "mutually entered for the benefit of each party."

**Plaintiffs' IPRA Requests and Subsequent Enforcement Action**

{5}      Between August 7 and September 3, 2014, Plaintiffs made a combined seven written requests of APS to inspect, among other public records, the Padilla Report and "documents referencing any complaints or allegations of misconduct regarding . . . Brooks." Defendants provided for inspection of certain requested records, denied the existence of any responsive records to other requests, and denied certain requests based on claimed exemptions under IPRA. Plaintiffs thereafter filed the IPRA action, alleging that "Defendants have failed to satisfy their burden of showing that the documents that Plaintiffs[] requested were completely exempt from disclosure under any of the exceptions enumerated in Section 14-2-1." In defending against the IPRA action, Defendants argued that the records withheld, including the Padilla Report, are protected by (1) the attorney-client privilege, (2) the attorney work-product doctrine, and/or (3) IPRA's exception for "letters or memoranda that are matters of opinion in personnel files." *See* § 14-2-1(A)(3), (6), (8).

3

**Plaintiffs' Attempt to Prove Waiver of Privilege as to the Padilla Report Through Sanders**

{6}     During the course of litigating the IPRA action, Plaintiffs were allowed to depose Padilla, Maestas, and Esquivel in order to adduce evidence relevant to the central issue of Defendants' claim that the Padilla Report is attorney-client privileged. Based on information learned in those depositions indicating that either the Padilla Report itself or its substance may have been disclosed to third parties, including possibly Sanders, Plaintiffs subpoenaed Sanders to produce "[a]ll documents, records, or things reflecting or recording any communications from [APS] or any APS representative, agent or attorney concerning any complaints or allegations of misconduct regarding Winston Brooks or [his wife] Ann Brooks made to APS or any member of the APS Board . . . after January 1, 2014." Sanders objected to the subpoena based in relevant part on a claim of attorney-client privilege. In her objection, Sanders explained that "[t]he only documents responsive to the subpoena are notes [she] made . . . at a meeting she attended with Tony Ortiz . . . and Winston Brooks . . . on August 11, 2014." She further explained, "[t]here are four pages of notes from that meeting and two pages might be viewed as responsive to the [s]ubpoena."

{7}     Plaintiffs also sought to depose Sanders to determine if conversations she had with various APS attorneys—particularly, her conversations with Ortiz on August 11 during the closed meeting—effected a waiver of the attorney-client privilege asserted by Defendants as to the Padilla Report. At her deposition, Sanders testified that she "represent[s Brooks and his wife] in matters that are related to . . . the employment and termination of employment of Winston Brooks" as superintendent of APS. She acknowledged that she had at least one conversation with APS attorney Art Melendres—whom she described as Brooks' attorney "during the time that he was [S]uperintendent" and continuing "after his employment ended in several matters that were pending"—at some point before the August 11 Board meeting, though she refused to describe the conversation based on a claim of attorney-client privilege. Regarding what occurred on August 11, Sanders explained that she accompanied Brooks to the Board meeting because "there was an agenda item involving . . . Superintendent Brooks' employment matters." She further explained that she and Brooks were asked to "sit in a room next to the boardroom" and that on more than one occasion, Ortiz left the boardroom and came to speak with her and Brooks. Sanders could not recall exactly how many times Ortiz came to speak with them during the meeting.

{8}     Sanders declined to answer Plaintiffs' questions regarding the conversations she had with Melendres and Ortiz, including whether Ortiz had described to her any portion of the Padilla Report, which she stated she neither received a copy of nor reviewed in full or in part. Specifically, she refused to answer the following questions:

- "What do you remember about [the] conversation [with Art Melendres]?"
- "When you were talking with Tony Ortiz at the time of the Board meeting, on or about August the 11th, . . . did you discuss a report or an investigation done by Agnes Padilla?"

4

- "Did Agnes[ Padilla's] name come up?"
- "Did Mr. Ortiz describe any portions of th[e Padilla R]eport to you?"
- "[W]hen you were meeting with Mr. Ortiz at the time of the Board meeting, did you discuss the [Padilla R]eport in any way?"
- "Do [the] notes [you took during your conversations with Ortiz] include information communicated to you by Tony Ortiz?"
- "When did discussions first begin between APS and Mr. Brooks or you regarding the possibility that he might resign?"

As the basis for refusing to answer these questions, Sanders asserted that her communications with Melendres and Ortiz were protected by the attorney-client privilege because her client, Brooks, "[a]s superintendent of APS[,]" shared a "common interest" with Melendres' client, APS, and Ortiz's client, the Board, making their communications privileged.[1] She alternatively refused to answer questions "on the basis of . . . open meetings confidentiality." When Plaintiffs attempted to explore the basis of Sanders' claim of a common interest privilege, Sanders additionally declined to answer questions regarding when the purported common interest arose and whether she considered APS "an adverse party" to Brooks during the course of her representation of Brooks.

**Plaintiffs' Motion to Compel Sanders' Testimony and Sanders' Claims of Privilege**

{9}     Plaintiffs thereafter filed a motion to compel Sanders to answer the questions she had refused to answer during her deposition regarding her communications with APS's attorneys[2] and to produce the notes she took during the August 11 meeting.[3] Noting that

---

[1] For clarity, we note that, although the record indicates that (1) Melendres and Ortiz represented different clients—Melendres represented APS, including Brooks in his official capacity as APS Superintendent, and Ortiz represented the Board only—and (2) Sanders had separate conversations with each attorney at different points in time, Sanders treated APS and the Board as a single unit for purposes of identifying the party with which Brooks purportedly shared a common interest. In other words, Sanders did not argue that the attorney-client privilege independently protected her conversation with Melendres based on a separate common interest that Brooks and APS, as Brooks' employer responsible for defending him in his official capacity, may have shared prior to August 11.

[2] Where the term "APS's attorneys" is used in this opinion, it reflects the parties' original use of that term, which we understand to collectively refer to Melendres and Ortiz.

[3] Plaintiffs expressly limited their motion with respect to Sanders' notes to "only the documentation of what was said by Mr. Ortiz to Ms. Sanders and Mr. Brooks." Plaintiffs made clear that they "do not seek those portions of the notes, if any, that are notes of confidential communications from Mr. Brooks to Ms. Sanders, or which constitute Ms. Sanders' mental impressions." Regarding communications from APS's attorneys, Plaintiffs were clear that they sought only communications *from* APS's attorneys *to* Sanders and Brooks, not communications made either by Sanders to Melendres and Ortiz or between Sanders and Brooks.

they took Sanders' deposition to determine only "if APS waived . . . asserted privileges by sharing the [R]eport or its contents with Ms. Sanders or Mr. Brooks[,]" Plaintiffs argued that the privileges asserted by Sanders—an OMA privilege and/or the attorney-client privilege—did not either exist or apply, respectively, under the facts of the case to shield from disclosure that which "APS's attorneys communicated to [Sanders]."

**{10}** In responding to the motion, Sanders first argued that "executive session communications are not discoverable" based on the OMA's allowance for public bodies to meet in closed session to discuss "limited personnel matters." According to Sanders, "[a]though [she] and Superintendent Brooks were in a separate room [during the August 11 closed Board meeting], they were essentially a part of the executive session during their communications with Mr. Ortiz." Sanders contended that "[a]s such, the communications are not subject to the public's right to know about the discussions at an open meeting."

**{11}** Sanders next expanded upon her claim that her communications with APS's attorneys are protected from compelled disclosure under the attorney-client privilege due to a common interest shared by APS and Brooks. With respect to Melendres, Sanders noted that "Art Melendres of the Modrall Law Firm has represented APS for years, including the entire time Winston Brooks was Superintendent[, and t]he Modrall Law Firm continued to represent Superintendent Winston Brooks in other APS[-]related matters after his employment with APS ended." With respect to Ortiz, Sanders asserted that "[f]rom August 11, 2014 to August 15, 2014[,] when a Settlement Agreement was executed Mr. Ortiz and Ms. Sanders were representing two constituents of APS: its Board and its Superintendent." Sanders thus contended that any communications between her and APS attorneys were privileged because New Mexico's attorney-client privilege extends to communications made "between the client or client's lawyer and another lawyer representing another in a matter of common interest[.]" Rule 11-503(B)(3). Sanders argued that "[i]n this case, APS and Superintendent Brooks had a commonality of interest which protected the confidential conversations to which Ms. Sanders was a participant before, during and after the August 11, 2014 Board meeting." According to Sanders, that common interest was "identified in the [a]genda for the August 11, 2014 Board meeting" and "related to [Brooks'] performance, evaluation, improvement plan, reports or concerns received by the President of the Board related to [Brooks], his contract or possible disciplinary action." Based on that, Sanders concluded that "the requirements of attorney-client privilege under the common interest rule have been met as to the communications involving Ms. Sanders and APS attorneys."

**{12}** In their reply, Plaintiffs argued that Sanders had "offer[ed] no evidence that APS and Mr. Brooks had decided on any joint effort or strategy, much less that they shared an *identical* legal interest in regard to the communications from APS's attorneys." Plaintiffs also argued that Sanders had failed to prove "that the communications at issue were confidential" and "were intended to be confidential at the time they were made." Plaintiffs pointed out that Sanders and APS's attorneys "had no written agreement to maintain the confidentiality of [their] communications nor did any person assert any promise or expectation of confidentiality." Thus, Plaintiffs contended that Sanders had

not met her burden of proving that the attorney-client privilege applied to shield from disclosure her communications with APS's attorneys and asked the district court to grant their motion.

**{13}** Following a hearing, the district court granted Plaintiffs' motion to compel Sanders to answer questions and produce in part the notes she took during the August 11 meeting. The court did so after concluding that (1) "[n]o Open Meetings Act [p]rivilege exists in New Mexico[,]" and (2) it "has not been provided with a factual basis to find that there was a common interest between APS and . . . Brooks[] between August 11 and August 15, 2014. Presentation of counsel is insufficient to establish that basis." The district court thus ordered Sanders to (1) "respond to the questions asked her during her deposition" and (2) "produce the notes of what Mr. Ortiz told Ms. Sanders and Mr. Brooks regarding the Padilla [R]eport and other documents."

## DISCUSSION

**{14}** On appeal, Sanders advances the same arguments she made below: (1) that communications regarding "limited personnel matters" that occur during an executive session of a public body are not discoverable based on the OMA, and (2) that her communications with APS's attorneys and any notes she took on August 11, 2014, are protected by the attorney-client privilege based on the common interest they shared in the communications. She effectively argues that the district court erred in concluding that no privilege applies under the facts of this case to protect her communications with APS's attorneys from discovery. Defendants, who filed a brief in support of Sanders' appeal, submit that this appeal involves two additional issues: (1) whether "an employer waive[s] IPRA protection of a personnel report regarding an employee by discussing that report with the subject employee" and (2) whether "a plaintiff in an IPRA case [is] permitted to ask witnesses about the document that may divulge the content of the protected document[.]" We disagree with Sanders on the merits of her arguments and with Defendants that this appeal involves any issues other than those advanced by Sanders.

**Standard of Review**

**{15}** We review discovery orders and initial determinations regarding the applicability of privileges for an abuse of discretion. *See Santa Fe Pac. Gold Corp. v. United Nuclear Corp.*, 2007-NMCA-133, ¶ 9, 143 N.M. 215, 175 P.3d 309; *Gingrich v. Sandia Corp.*, 2007-NMCA-101, ¶ 8, 142 N.M. 359, 165 P.3d 1135. "An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Benz v. Town Ctr. Land, LLC*, 2013-NMCA-111, ¶ 11, 314 P.3d 688 (internal quotation marks and citation omitted). We review de novo a district court's construction of a privilege, including its determination regarding whether one exists under New Mexico law. *Cf. Pincheira v. Allstate Ins. Co.*, 2008-NMSC-049, ¶ 14, 144 N.M. 601, 190 P.3d 322 (reviewing de novo determinations regarding "the intricate interplay among discovery and privilege rules related to trade secrets").

**General Rules Governing Discovery and Assertions of Privileges**

**{16}** Rule 1-026(B)(1) NMRA provides that "[p]arties may obtain discovery of any information, *not privileged*, which is relevant to the subject matter involved in the pending action." (Emphasis added.) Privileged information, then, is not discoverable. *Pincheira*, 2008-NMSC-049, ¶ 22. "[F]or a privilege to exist in New Mexico, it must be recognized or required by the Constitution, the Rules of Evidence, or other rules of [our Supreme] Court." *Republican Party of N.M. v. N.M. Taxation & Revenue Dep't*, 2012-NMSC-026, ¶ 35, 283 P.3d 853 (internal quotation marks and citation omitted); *see* Rule 11-501 NMRA (providing in the Rules of Evidence that "[u]nless required by the [C]onstitution, these rules, or other rules adopted by the [S]upreme [C]ourt, no person has a privilege to[:] A. refuse to be a witness; B. refuse to disclose any matter; C. refuse to produce any object or writing; or D. prevent another from being a witness, disclosing any matter, or producing any object or writing"). Legislated privileges, i.e., privileges provided by statute, "are generally regarded as an unconstitutional intrusion into judicial rule-making" and are, therefore, not recognized. *Breen v. N.M. Taxation & Revenue Dep't*, 2012-NMCA-101, ¶ 23, 287 P.3d 379. "The burden of proving an assertion of privilege rests upon the party asserting such claim." *Krahling v. Exec. Life Ins. Co.*, 1998-NMCA-071, ¶ 15, 125 N.M. 228, 959 P.2d 562.

**I.      Section 10-15-1(H)(2) of the OMA Does Not Create a Privilege For or Immunize From Discovery "Limited Personnel Matters" Discussed in a Closed Meeting**

**{17}** Section 10-15-1(H)(2) of the OMA exempts from certain requirements of the OMA "limited personnel matters[,]" which are defined as "the discussion of hiring, promotion, demotion, dismissal, assignment or resignation of or the investigation or consideration of complaints or charges against any individual public employee[.]" Based on this exemption, Sanders argues that "limited personnel matters" discussed during public meetings that are closed pursuant to the OMA are not a proper subject of discovery. While acknowledging that the OMA "does not specifically address whether the discussions occurring within an executive session are immune from discovery for litigation purposes[,]" Sanders asks this Court to conclude that allowing discovery of her conversations with Ortiz will "impair the public policy decision made by the Legislature" to allow sensitive, private personnel matters to remain confidential. She reasons that the OMA, "by allowing executive sessions related to limited personnel matters, certainly indicates a strong public policy to protect the confidentiality of those deliberations."

**{18}** The problem with Sanders' argument is that it fails to recognize that "confidentiality" and "privilege" are "legally distinct concepts." *See State ex rel. Balderas v. ITT Educ. Servs., Inc.*, 2018-NMCA-044, ¶ 10, 421 P.3d 849. "[I]nformation that is confidential is not necessarily protected by a legally recognized privilege." *Id.* Critically, Sanders identifies no privilege—either adopted by our Supreme Court or recognized under the Constitution—on which to base her argument that communications regarding "limited personnel matters" that occur during a closed public meeting are immune from discovery. To the extent she suggests that we construe Subsection (H)(2) as either creating or supplying the justification for recognizing such a privilege, we decline

8

to do so in light of established New Mexico privilege law. *See Republican Party of N.M.*, 2012-NMSC-026, ¶ 35; *Breen*, 2012-NMCA-101, ¶ 23. We therefore conclude that the district court properly determined that Section 10-15-1(H)(2) of the OMA does not provide a stand-alone basis for Sanders to resist discovery.

**II.     Sanders Failed to Meet Her Burden of Establishing the Applicability of the Attorney-Client Privilege to Her Communications With APS's Attorneys**

**A.     Proving the Applicability of the Attorney-Client Privilege Based on a Claimed Common Interest**

**{19}**     To establish the applicability of the attorney-client privilege, Sanders bore the burden of proving all elements of the privilege as to each communication claimed to be privileged. *See Santa Fe Pac. Gold Corp.*, 2007-NMCA-133, ¶¶ 19-21; *Piña v. Espinoza*, 2001-NMCA-055, ¶ 24, 130 N.M. 661, 29 P.3d 1062. In New Mexico, the basic elements of the attorney-client privilege are "(1) a communication (2) made in confidence (3) between privileged persons (4) for the purpose of facilitating the attorney's rendition of professional legal services to the client." *Santa Fe Pac. Gold Corp.*, 2007-NMCA-133, ¶ 14; *see* Rule 11-503(B). The third element—"between privileged persons"—may be established by demonstrating that the communication occurred "between the client or client's lawyer and another lawyer representing another in a matter of common interest[.]" Rule 11-503(B)(3).[4] A person who relies on this subsection to claim privilege as to particular communications bears the additional burden of establishing, at a minimum, a factual basis allowing the district court to find that: (1) the parties to the communication shared an identical legal interest in the subject matter of each communication claimed to be privileged; (2) the communication was made "during the

---

[4] Commonly known as the "common interest doctrine," this aspect of the attorney-client privilege rule may function as either an extension of the privilege or an exception to waiver of the privilege. *See* Rule 11-503(B)(3); Rule 11-511 NMRA (providing that the rule of waiver "does not apply if the disclosure is a privileged communication"); Katharine Traylor Schaffzin, *An Uncertain Privilege: Why the Common Interest Doctrine Does Not Work and How Uniformity Can Fix It*, 15 B.U. Pub. Int. L.J. 49, 54-55 (2005) (explaining that "[m]any courts characterize [the doctrine] as an extension of the attorney-client privilege and many more describe it as an exception to the traditional waiver of the attorney-client privilege that occurs when a client discloses confidential communications to a third party" (footnote omitted)).

In this case, Sanders invokes the doctrine in its function as an extension of the privilege, i.e., to establish the privilege in the first instance, not to directly defend against a claim of waiver resulting from a third-party disclosure. *Cf. Santa Fe Pac. Gold Corp.*, 2007-NMCA-133, ¶¶ 19, 25 (setting up a three-part burden-shifting analysis in a case where the doctrine was raised as a defense to waiver based on undisputed disclosure of a purportedly privileged document to a third party). We point out this distinction in order to make clear why our common interest doctrine analysis both adds to and differs in some respects from the framework adopted and followed in *Santa Fe Pacific Gold Corp.*

course of a joint defense effort between the resisting party and the third party" and "in furtherance of that effort"; and (3) the shared identical legal interest existed at the time the communication was made as reflected by a preexisting, or at the very least contemporaneous, agreement of the parties.[5] *Santa Fe Pac. Gold Corp.*, 2007-NMCA-133, ¶¶ 16, 18, 24; *see Ken's Foods, Inc. v. Ken's Steak House, Inc.*, 213 F.R.D. 89, 93 (D. Mass. 2002) ("While a written agreement is not a prerequisite for invoking the common interest doctrine, parties seeking to invoke the exception must establish that they agreed to engage in a joint effort and to keep the shared information confidential from outsiders." (citation omitted)). "[A]lthough a common interest agreement can be inferred where two parties are clearly collaborating in advance of litigation, mere 'indicia' of joint strategy as of a particular point in time are insufficient to demonstrate that a common interest agreement has been formed." *Hunton & Williams v. U.S. Dep't of Justice*, 590 F.3d 272, 284-85 (4th Cir. 2010). Additionally, "a shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within [the common interest doctrine]." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012). There must be some showing that the parties, indeed, came to an agreement "embodying a cooperative and common enterprise towards an identical legal strategy." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 284 F.R.D. 132, 139 (S.D.N.Y. 2012) (internal quotation marks and citation omitted). Evidence of the parties' agreement is critical because "the privilege should not be used as a post hoc justification for a client's impermissible disclosures." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 365 (3d Cir. 2007).

**{20}**     A party's bald assertions that disclosure of information sought in discovery would violate a privilege are insufficient to meet his or her burden. *See United Nuclear Corp. v. Gen. Atomic Co.*, 1980-NMSC-094, ¶ 267, 96 N.M. 155, 629 P.2d 231. When a party asserts a privilege as a basis for withholding information in discovery, "the party shall make the claim expressly and shall describe the nature of the . . . communications . . . not . . . disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege." Rule 1-026(B)(7)(a); *see Piña*, 2001-NMCA-055, ¶ 24 (explaining that the party asserting the privilege must do so "with sufficient detail so that [the party seeking disclosure], and ultimately the [district] court, may assess the claim of privilege as to *each* withheld *communication*").

**{21}**     "We expressly disapprove of the practice of permitting the proponent of a privilege to rely on an initial conclusory assertion of a privilege and to gradually unveil the basis for her claims of privilege." *Piña*, 2001-NMCA-055, ¶ 25. "The party resisting discovery has the burden to clarify and explain its objections and to provide support therefor." *United Nuclear Corp.*, 1980-NMSC-094, ¶ 267 (internal quotation marks and citation omitted). Such support may be provided through a variety of mechanisms, including submission of a privilege log or an affidavit, in camera interview, or other

---

[5] This third element was not addressed in *Santa Fe Pacific Gold Corp.*, a case in which it was apparently undisputed that the parties between whom disclosure occurred had "entered into a common interest agreement." 2007-NMCA-133, ¶ 19.

means "as required by the circumstances of a particular case." *Piña*, 2001-NMCA-055, ¶¶ 24, 28; *see Albuquerque Rape Crisis Ctr. v. Blackmer*, 2005-NMSC-032, ¶ 21, 138 N.M. 398, 120 P.3d 820 (contemplating the need for an in camera interview to determine whether certain communications claimed to be privileged were made for the purpose for which the privilege was established); *see also SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 514 (D. Conn. 1976) (ordering the deponent lawyer to submit an affidavit for in camera review that describes the conversations he had with a third party to determine whether a common interest existed between the parties at the time of the communication); 2 Paul R. Rice, *Attorney-Client Privilege in the United States* § 11:12, at 1066-67 (2017-2018 ed.) (explaining that courts have accepted ex parte affidavits despite "an element of adversarial unfairness in this process" because "the courts feel justified in following this procedure when they are faced with the undesirable alternatives of sacrificing the confidentiality of the communication or leaving the issue unresolved"). "Failure to adequately support a claim of privilege thwarts both the adversarial process and meaningful independent judicial review and justifies denial of the claim of privilege." *Piña*, 2001-NMCA-055, ¶ 24.

**B.      Whether the District Court Abused Its Discretion in Determining That Sanders Failed to Meet Her Burden**

**{22}**    Here, the district court concluded that it had "not been provided with a factual basis to find that there was a common interest between APS and . . . Brooks[] between August 11 and August 15, 2014." We understand the district court's ruling in this regard to reflect its determination that Sanders failed to meet her burden of establishing the essential elements necessary to prove the applicability of the attorney-client privilege, based on a claimed common interest, to her communications with APS's attorneys. We consider whether the district court's conclusion was "clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Benz*, 2013-NMCA-111, ¶ 11 (internal quotation marks and citation omitted).

**{23}**    As noted previously, after first asserting the attorney-client privilege based on a purported common interest during her deposition, Sanders refused to answer the question, "[W]hat do you believe th[e] joint interest [between Brooks and APS and its Board] to have been?" She additionally refused to answer the following questions: (1) "When did discussions first begin between APS and Mr. Brooks or you regarding the possibility that he might resign?" (2) "[W]hen did [the common interest] arise?" and (3) "Did you consider APS . . . an adverse party to [Brooks] during the course of [your] representation?" Sanders' deposition testimony thus not only fails to provide a factual basis establishing any of the elements of a common interest but also employs the very practice this Court "expressly disapprove[d] of" in *Piña*—that is, relying on an initial conclusory assertion of a privilege and failing to provide basic information necessary to assess the claim of privilege. 2001-NMCA-055, ¶ 25. Moreover, her refusal to answer questions regarding formation of the common interest—coupled with her failure to thereafter supply a factual basis allowing the district court to find that she, Melendres, and Ortiz indeed established a common interest agreement prior to disclosing any potentially privileged information—justifies the district court's denial of her claim of

privilege. *See id.* ¶ 24; *cf. In re Teleglobe Commc'ns Corp.*, 493 F.3d at 365 (explaining that "the privilege should not be used as a post hoc justification for a client's impermissible disclosures"); *Ken's Foods, Inc.*, 213 F.R.D. at 93 (explaining that "parties seeking to invoke the [common interest] exception must establish that they agreed to engage in a joint effort and to keep the shared information confidential from outsiders").

{24}    Additionally, our review of the district court record confirms that it contains bare and unsupported assertions by Sanders, her counsel, and Ortiz regarding what the parties' purported common interest generally was. Notably, those assertions, themselves, were vague, unclear, and not entirely consistent. In responding to Plaintiffs' motion to compel, Sanders merely cited the agenda for the August 11, 2014 Board meeting in identifying the common interest as "relat[ing] to [Brooks'] performance, evaluation, improvement plan, reports or concerns received by the President of the Board related to [Brooks], his contract or possible disciplinary action." Then, at the hearing on Plaintiffs' motion to compel when asked by the district court to "tell [it] what the common interest is" because the court did not understand it as presented, Sanders' counsel stated, "The common interest is to work out a possible exit for . . . Brooks. If . . . both sides decided that it was in the best interest for him to leave, then they were working on that . . . common interest." When pressed by the district court to explain the "identical legal interest tied to [Sanders' and Ortiz's] communications[,]" Sanders' counsel offered, "I think that the identical legal interest is for both sides to be looking at whatever legal issues may exist with regard to working out this common goal to separate amicably." Sanders' counsel summed up the matter with, "What's the common legal goal here? They're trying to make a plan." Ortiz, in joining Sanders to argue against the motion, described the parties' common interest as, "You have a problem with an employee; you invite him in. What's our common interest? Our common interest is, we're trying to resolve this issue. . . . When this starts out, the common interest is, [c]an we sit down and work this out?"

{25}    Critically, the record contains no indication that Sanders either employed or attempted to employ any of the means available to her—e.g., affidavit or seeking in camera presentation of testimony or evidence to the district court—to supply the facts necessary to meet her burden. And she did not do so despite relative clarity in our law permitting privilege proponents to employ a variety of procedures—such as submission of a privilege log, an affidavit, an ex parte affidavit, live testimony, or some other means of demonstrating a factual basis for establishing the applicability of the privilege—to demonstrate the applicability of a privilege given the particular circumstances of a given case. *See Piña*, 2001-NMCA-055, ¶¶ 24, 28 (providing that the plaintiff "must provide a privilege log" and that the log, "together with any supplemental affidavits[,] must affirmatively demonstrate an objectively reasonable basis for each assertion of privilege[,]" but also explaining that the procedural guidelines for asserting a privilege "are not immutable" and that "[t]hey may be modified as required by the circumstances of a particular case"); *see also Albuquerque Rape Crisis Ctr.*, 2005-NMSC-032, ¶ 21 (noting that the court may need to conduct an in camera inspection to determine whether certain communications are discoverable); *cf. State v. Perez*, 1985-NMCA-041, ¶ 13, 102 N.M. 663, 699 P.2d 136 (remanding the case for an in camera hearing to determine a

factual matter after concluding that "[w]ithout conducting the in camera hearing, the court was in no position to determine" the necessary factual question before it).

**{26}** Even on appeal, Sanders merely lists seven pieces of "evidence" that she contends "established" that Brooks and the Board had "an identical interest" and that she argues provided the district court with "substantial evidence to support the claim of common interest." That "evidence" comprises: (1) the minutes of the Board's July 16, 2014 meeting indicating that the Board convened in executive session to discuss Brooks' performance improvement plan; (2) Maestas's July 18, 2014 statement to her fellow Board members, explaining why she wanted to commission Padilla to conduct "an independent investigation into allegations regarding Superintendent Brooks"; (3) the minutes of the Board's August 11 meeting, indicating that the closed meeting lasted from 5:01 p.m. until 10:07 p.m. and that no action was taken on the "limited personnel matter" regarding Brooks; (4) the settlement agreement, including certain specific provisions therein; and (5) three findings from the district court's own order in which the district court (a) recognized that Ortiz represented the Board and Sanders represented Brooks, (b) referred to the purpose of the August 11 closed meeting as identified in the meeting minutes, and (c) noted that Ortiz came into the separate room where Sanders and Brooks were located during the closed meeting and had conversations with them.

**{27}** We fail to see—and Sanders fails to explain—how this "evidence" establishes the elements of a common interest and compels a contrary conclusion to that reached by the district court. At best, it arguably offers indicia that Brooks and APS at some time— possibly even various times—shared a common goal or desire (e.g., to clear Brooks' name, or to keep the Padilla Report from being disclosed, a common desire we note they continue to share), which is insufficient to establish that they shared an identical legal interest in the matters that Melendres and Ortiz communicated to Sanders. *See In re Pac. Pictures Corp.*, 679 F.3d at 1129 (stating that "a shared desire to see the same outcome in a legal matter is insufficient" for the common interest exception to apply); *Hunton & Williams*, 590 F.3d at 283-85 (" '[I]ndicia' of joint strategy as of a particular point in time are insufficient to demonstrate that a common interest agreement has been formed."). Indeed, much of what Sanders contends supports her position of a common interest instead suggests the possibility that Brooks' interests were *not* aligned with those of the Board, which had investigated allegations of his possible misconduct and then convened in a lengthy and non-public executive session regarding that personnel matter after having received the Padilla Report. Particularly given the existence of facts that give rise to the appearance that the parties had antagonistic interests, it was incumbent upon Sanders to not only combat that appearance but also affirmatively and specifically establish the existence of an agreement between the parties regarding the identicality of their *legal* interest in communications they intended to be privileged.

**{28}** Moreover, what we do see from our review of the record is that the evidence Sanders now points to was not presented by Sanders to the district court—either as an evidentiary proffer or even in her response brief—as supplying a basis for finding the existence of a common interest. Indeed, much of that evidence was proffered by Plaintiffs, not Sanders, for purposes unrelated to the issue of whether the Board and

13

Brooks had a common interest at the time of Sanders' communications with Ortiz. Sanders' reliance on such evidence now, after the fact, fails to supply a basis for reversing the district court's determination that it had not been provided a factual basis for finding a common interest.

{29}    Because we cannot say that the district court's ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case, we conclude that the district court did not abuse its discretion in ruling that Sanders failed to meet her burden of establishing the applicability of the attorney-client privilege. We acknowledge the difficult position in which Sanders has been put and her ensuing effort to zealously represent her client and meet her ethical obligations as a lawyer. Having failed her burden of establishing privilege, however, we reject Sanders' contention that the district court's order or this Court's affirmance of the same results in "compel[ling] her to do that which her ethical obligations prohibit." *See* Rule 16-106(B)(6) NMRA (permitting a lawyer to "reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary . . . to comply with . . . a court order"); Rule 16-106(A) (providing that "[a] lawyer shall not reveal information . . . *unless* . . . disclosure is permitted by Paragraph B of this rule" (emphasis added)).

### III.    Defendants' Arguments Are Without Merit

{30}    Defendants join Sanders in her arguments regarding the OMA and the applicability of the common interest aspect of the attorney-client privilege, adopting them by reference and offering no additional argument or analysis to support those proffered bases for reversal. Defendants advance two additional arguments for why this Court should reverse the district court's order and conclude that Plaintiff's motion to compel should be denied.

{31}    Defendants first contend that Plaintiffs' "discovery request to compel Ms. Sanders' testimony under the rationale that it might create a broader waiver of the entire [Padilla] Report is faulty" and that this Court "should not allow the search for a waiver as a rationale to compel the discovery sought from Ms. Sanders." This argument first reflects a misunderstanding of Plaintiffs' argument regarding the relevance and discoverability of Sanders' testimony. The record plainly establishes that Plaintiffs seek Sanders' testimony for the limited purpose of proving that APS voluntarily disclosed the Padilla Report or its substance to Sanders, thereby effecting a waiver of the attorney-client privilege and the attorney work product protection and defeating Defendants' claim that the Report is exempt from inspection under Section 14-2-1(A)(6), (8).

{32}    Defendants' argument also reflects a misunderstanding of the limited scope of this appeal, including the applicable law that resolves it. Defendants argue that this Court "should begin the analysis of any alleged waiver" by recognizing "the clear protections IPRA affords employer/employee information" via Section 14-2-1(A)(3)'s exemption for "letters or memoranda that are matters of opinion in personnel files." Defendants' argument ignores that this Court is not presently faced with any questions regarding the applicability of Section 14-2-1(A)(3)'s exemption, much less whether any waiver has

14

occurred under any IPRA exception. We agree with Plaintiffs that because the district court has not yet been asked to rule on whether Section 14-2-1(A)(3)'s exemption applies, this argument is not properly before us.

**{33}** Defendants next argue that Plaintiffs "should not be permitted to compel testimony about the substance of the [Padilla] Report" by "forc[ing] Ms. Sanders to discuss what she may have heard about the [R]eport during executive session." Again, Defendants did not raise this issue before the district court below, and it is not properly before us in this interlocutory appeal.

**CONCLUSION**

**{34}**   For the foregoing reasons, we affirm the district court's order.

**{35}   IT IS SO ORDERED.**

 

 

_____

**J. MILES HANISEE, Judge**

**WE CONCUR:**

_____

**STEPHEN G. FRENCH, Judge**

_____

**JENNIFER L. ATTREP, Judge**