**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2024-NMCA-054**

**Filing Date: February 12, 2024**

**No. A-1-CA-39929**

**D.R. HORTON, INC. and DRH SOUTHWEST CONSTRUCTION, INC.,**

      Plaintiffs-Appellants,

v.

**TRINITY UNIVERSAL INSURANCE COMPANY; KEMPER CORPORATION; MERASTAR INSURANCE COMPANY; and AMTRUST INSURANCE COMPANY OF KANSAS, INC. f/k/a TRINITY UNIVERSAL INSURANCE COMPANY OF KANSAS, INC.,**

      Defendants-Appellees.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Francis J. Mathew, District Court Judge**

Landry & Ludewig, L.L.P.
Stephanie Landry
Glenn R. Smith
Albuquerque, NM

Stalter Law LLC
Kenneth H. Stalter
Albuquerque, NM

for Appellants

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Jennifer A. Noya
Jeremy K. Harrison
Albuquerque, NM

for Appellees

Stiff, Garcia & Associates, LLC

John S. Stiff
Edward F. Snow
Albuquerque, NM

for Appellee Amtrust Insurance Company of Kansas

**OPINION**

**WRAY, Judge.**

**{1}**     Having granted the motion for rehearing and considered the response, we withdraw the opinion filed December 18, 2023, and substitute the following in its place. This case involves the intersection of an insurer's well-established duty to defend and an insured's contractual duties under an insurance policy. In the district court, Appellants D.R. Horton, Inc. and DRH Southwest Construction, Inc. (collectively, Horton) alleged, in addition to many other claims, that the insurers, Appellees Trinity Universal Insurance Company (Trinity Universal), Trinity Universal Insurance Company of Kansas (Trinity Kansas), and Amtrust Insurance Company of Kansas, Inc. (Amtrust) (collectively, Defendants), had a duty to defend a series of claims relating to construction defects. We refer to Trinity Kansas and Trinity Universal collectively as "Trinity." The district court concluded that Defendants suffered substantial prejudice from Horton's multi-year delay in providing notice of the claims to Defendants and granted summary judgment in Defendants' favor. Horton appeals the dismissal of its claims as well as a series of other summary judgment denials and discovery rulings. Despite evidence that Horton intentionally delayed notifying Defendants of the claims, contrary to the requirements of the insurance policies at issue, Trinity did not defend Horton when it received actual notice of a claim that was arguably covered. *See Garcia v. Underwriters at Lloyd's, London*, 2008-NMSC-018, ¶ 16, 143 N.M. 732, 182 P.3d 113. As a policy matter, New Mexico law prioritizes the duty to defend over potential contract defenses—like the failure to give notice. *See id.* ¶¶ 18-19; *Dove v. State Farm Fire & Cas. Co.*, 2017-NMCA-051, ¶ 15, 399 P.3d 400; *State Farm Fire & Cas. Co. v. Price*, 1984-NMCA-036, ¶¶ 30, 33, 101 N.M. 438, 684 P.2d 524, *overruled on other grounds by Ellingwood v. N.N. Invs. Life Ins. Co.*, 1991-NMSC-006, ¶ 17, 111 N.M. 301, 805 P.2d 70. Thus, if a jury determines that the insurer breached the duty to defend, the insurer "suffers serious consequences," including the loss of certain contract-based defenses—like the insured's failure to give notice. *Price*, 1984-NMCA-036, ¶¶ 32-33. As a result, under New Mexico law, when the duty to defend remains in dispute, summary judgment may not be granted on defenses that implicate the insured's breach of the insurance contract provisions. *Id.* We therefore reverse the district court's grant of summary judgment in Defendants' favor based on notice to the insurer. Otherwise, we affirm.

**BACKGROUND**

**{2}**     Horton began the development of subdivisions in 2005, and Vinyard & Associates, Inc. (Vinyard) provided Horton with geotechnical consulting services as a

subcontractor. Horton and Vinyard entered into multiple contracts for this work, and under each contract, Vinyard was required to obtain a commercial general liability policy that included Horton as an additional insured. Using an insurance agency, Berger Briggs Real Estate & Insurance, Inc. (Berger Briggs), Vinyard obtained a commercial general liability policy from Trinity Kansas (the CGL Policy) and an umbrella policy from Trinity Universal (the Umbrella Policy), with both policies (collectively, the Trinity Policies) covering the period between October 28, 2006 to October 28, 2007. The Trinity Policies include both (1) an obligation for the insured to notify the insurer of occurrences, offenses, claims, or suits; and (2) "the right and duty" for the insurer to defend the insured against any suit for damages to which the insurance applied.

**{3}**     In 2008, Horton received notice that some subdivision homes could be experiencing construction defects. Horton and Vinyard communicated about the defects and claims by the homeowners, and Horton involved other subcontractor insurers, including Acadia Insurance Company (Acadia) and BITCO General Insurance Corporation (BITCO). The homeowner complaints began to be filed in November 2009 and a large number were eventually made part of a "consolidated arbitration." *See Lyndoe v. D.R. Horton, Inc.*, 2012-NMCA-103, ¶¶ 2-3, 5, 287 P.3d 357 (describing the homeowner complaint litigation at issue in the present case). Communications continued between Horton and Berger Briggs, Horton and Vinyard, and Vinyard and Berger Briggs. Beginning in 2012, two individual arbitrators in the homeowner cases determined that Horton did not heed Vinyard's advice. On March 5, 2014, a few months before the first consolidated arbitration hearing, the consolidated arbitrator determined that "certain liability findings" from the prior two arbitrations, including Horton's failure to follow Vinyard's advice, would have preclusive effect—though for future claims, Horton would be permitted to question the relevancy of the specific findings.

**{4}**     After the March 2014 collateral estoppel ruling from the consolidated arbitrator and consolidated arbitration hearings held in early June 2014, Acadia wrote to Trinity regarding the CGL and Umbrella policies. In letters dated June 23, 2014, Acadia requested that Trinity contribute to Horton's defense. Trinity formally responded on August 25, 2014, and indicated that Trinity had not previously received notice of the claims but an investigation had commenced. Trinity explained that Horton did not appear to have been added to the policies as an additional insured—which had been required under the original contracts between Horton and Vinyard—and additionally noted that the homeowner complaints that Acadia had provided did not allege fault on Vinyard's part—only fault by Horton for not heeding Vinyard's recommendations. Trinity requested that Acadia provide information to assist the investigation and coverage analysis—specifically, information that would demonstrate that Horton was an additional insured or that Vinyard was at fault. Trinity wrote to Acadia again on October 1, 2014, November 17, 2014, and on February 4, 2015. Having received no response from Acadia, in the February 2015 letter, Trinity advised Acadia that "Trinity formally denies your request on behalf of Acadia Insurance to participate with Acadia in the defense of Horton in the" two identified proceedings. Trinity did not contact Vinyard, Berger Briggs, or Horton before sending the February 2015 letter denying Horton a defense.

**{5}**     On December 18, 2015, BITCO wrote to Trinity and requested that Trinity provide a defense for Horton. Trinity responded on January 6, 2016, and observed that it had previously requested information from Acadia that was not provided, asked BITCO to provide the same information to further a renewed investigation, and raised the same concerns about coverage. It appears from the record that, like Acadia, BICTO did not respond to Trinity's requests for more information.

**{6}**     On February 1, 2018—two years removed from the most recent correspondence relating to the presence or absence of coverage for Horton under Trinity policies and eight years removed from Horton's first expression of concern regarding the claims of homeowners—Horton wrote directly to Trinity's counsel for the first time. In that letter, Horton referenced the 2014 and 2015 letters from Acadia and BITCO and argued that Trinity had failed to legitimately respond to those demands for a defense. Trinity responded on June 7, 2018, and though the entire letter does not appear to be in the record, the reviewable pages reiterate Trinity's objections to coverage.

**{7}**     On July 26, 2018, Horton filed suit against Trinity, other insurers who had issued policies for different periods of time during the Horton-Vinyard contractual relationship, and Amtrust, which, as a result of an asset purchase, had acquired the policies of Trinity Kansas. This complaint marks the start of the litigation currently before this Court. Horton brought multiple claims directly against Trinity and Amtrust as well as a claim for judgment on an arbitration award that Horton had secured against Vinyard for breach of contract. In the claim for a judgment, Horton alleged that Defendants must pay what Vinyard owed for the breach of contract, because Horton was an additional insured or Vinyard's indemnitee.

**{8}**     Between October 2020 and May 2021, Horton, Trinity, and Amtrust filed twenty motions for summary judgment. In Trinity's motion for summary judgment on Horton's claim to coverage under the Umbrella Policy (the Umbrella Motion), which Amtrust joined, and Trinity's motion for summary judgment on all claims based on Horton's failure to give timely notice of the homeowner claims as required by the Trinity Policies (the Notice Motion), Trinity set forth additional evidence that Horton had intentionally not demanded a defense from Trinity.

**{9}**     This information, together with Horton's explicit requests for a defense from Acadia and BITCO, led Trinity to assert in the present case that the only reasonable inference to draw was that Horton strategically chose not to pursue a defense from Trinity in the early years of the homeowner litigation and therefore failed to give the required notice under the Trinity Policies. In relevant part, Horton responded that the reasons for not pursuing a defense from Trinity before 2014 were immaterial. At the hearings related to Horton's motion for summary judgment on Trinity's breach of the duty to defend (the DTD Motion), Horton additionally argued, again in relevant part, that (1) Trinity could not assert Horton's failure to cooperate as a defense if Trinity had breached the duty to defend; and (2) Horton's reasons for not requesting a defense sooner were irrelevant because Horton sought no damages for the period before the

2014 notice was provided. Horton did not, however, deny that the decision to delay pursing a defense from Trinity was strategic.

{10}    Of the twenty motions filed (between these parties), the district court granted only a portion of the Umbrella Motion and the Notice Motion. The remainder, with the exception of four defense motions that were apparently unresolved, were denied. Importantly, the district court denied Horton's DTD Motion for summary judgment based on the existence of disputed material facts, and Trinity had not filed a competing motion for summary judgment on the duty to defend. In granting Trinity's Umbrella Motion, the district court ruled that "summary judgment should be entered on any [of Horton's] claim[s] that [it is] entitled to coverage as an additional insured under the" Umbrella Policy—but did not grant summary judgment on "extra-contractual claims related to the" Umbrella Policy. Regarding the Notice Motion, the district court stated that Trinity had made a prima facie showing that it was entitled to judgment as a matter of law and ruled that Horton's response did not meet the burden to demonstrate that disputed issues of fact would prevent summary judgment on notice. Specifically, the district court determined as a matter of law that

> Horton's delay over a period of years in giving notice to [Trinity and Amtrust] of homeowner claims while engaging in litigation and/or arbitration proceedings and settling with homeowners or otherwise resolving claims created substantial prejudice to them. . . . Such delay relieved [Trinity and Amtrust] of both the duty to defend and the duty to indemnify.

Based on this conclusion, the district court dismissed Plaintiffs' claims against Defendants with prejudice. This appeal followed.

**DISCUSSION**

{11}    On appeal, Horton challenges nine of the district court's summary judgment orders and two discovery-related orders. We review only the district court's grant of summary judgment on the Notice Motion and the discovery rulings.

**I.      The Insured's Failure to Give Notice as Required by the Insurance Contract Is Not an Available Defense to a Claim That the Insurer Breached the Duty to Defend**

{12}    We review the "grant of summary judgment de novo." *Dove*, 2017-NMCA-051, ¶ 10. As we have often explained, "[s]ummary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law[,]" with "[a]ll reasonable inferences . . . construed in favor of the non-moving party." *Id.* (internal quotation marks and citations omitted). Should there be "any question as to any issue of material fact, summary judgment is inappropriate." *Allsup's Convenience Stores, Inc. v. N. River Ins. Co.*, 1999-NMSC-006, ¶ 43, 127 N.M. 1, 976 P.2d 1 (internal quotation marks and citation omitted). While Horton contests the district court's grant of

partial summary judgment on the Umbrella Motion and denial of several other motions, its primary challenge is to the district court's dismissal of its claims based on the grant of Trinity's Notice Motion and the corresponding denial of Horton's DTD Motion. The parties' arguments implicate two seemingly separate lines of authority—the law regarding the duty to defend and the law regarding the duty of the insured to give notice, which we pause our analysis to review.

## A. The Duty of Insurers: The Duty to Defend

**{13}** In New Mexico, "[t]he duty of an insurer to defend arises from the allegations on the face of the complaint or from the known but unpleaded factual basis of the claim that brings it arguably within the scope of coverage." *Am. Gen. Fire & Cas. Co. v. Progressive Cas. Co.*, 1990-NMSC-094, ¶ 11, 110 N.M. 741, 799 P.2d 1113. An insurer must defend (1) if a complaint filed "alleges facts potentially within the coverage of the policy"; (2) if the facts in the complaint do not clearly assert the facts so that the insurer can determine the action does not fall within the coverage of the policy (because doubts about coverage are "resolved in the insured's favor"); or (3) "if the insurer is notified of factual contentions or if the insurer could have discovered facts, through reasonable investigation, implicating a duty to defend." *Dove*, 2017-NMCA-051, ¶ 11 (internal quotation marks and citations omitted). As this Court has explained, "[t]he upshot of our case law in this realm is this: an insurer who refuses to defend a covered insured without seeking a judicial determination that the alleged insured is not covered under the policy or without a voluntary waiver from the insured does so at its peril." *Id.* ¶ 14 (citations omitted). We described the insurer's peril as follows: "[A]n insurer who unilaterally refuses to defend effectively waives its ability to later challenge the underlying merits as to coverage because the ultimate question of coverage is to be properly resolved in the primary action in order to protect the interests of the insured and for judicial efficiency." *Id.* ¶ 15. The duty to defend "may arise at the beginning of litigation or at some later stage if the issues are changed so as to bring the dispute within the scope of policy coverage." *Am. Gen. Fire & Cas. Co.*, 1990-NMSC-094, ¶ 11.

**{14}** In *Garcia*, our Supreme Court held that "actual notice is sufficient to trigger the duty to defend unless the insured affirmatively declines a defense," 2008-NMSC-018, ¶ 1, and that "for the purposes of determining when an insurer's duty to defend arises, actual notice means notice from any source sufficient to permit the insurer to locate and defend its insured." *Id.* ¶ 25 (alteration, quotation marks, and citations omitted). The Court cautioned, however, that the duty to defend need not be automatic and stated instead that on receiving actual notice, "the insurer may protect its interests simply by contacting the insured to ascertain whether the insurer's assistance is desired[, and i]f the insured indicates that it does not want the insurer's assistance, or is unresponsive or uncooperative, the insurer is relieved of its duty to defend." *Id.* ¶ 19 (internal quotation marks and citation omitted). While the notice received by the *Garcia* insurer satisfied the new standard for actual notice in the context of the duty to defend, the case was nevertheless remanded. *Id.* ¶¶ 25, 27. Fact questions remained about whether the insured "was foregoing a defense from" the insurer, *id.* ¶ 26, because the insurer did not advise the insured that no demand had been made and the record contained

"ambiguous communications" between the insurer and the estate representative, *id.* ¶¶ 22-23. Our Supreme Court, in remanding, determined that "the key inquiry in this case is whether under all the circumstances, including the correspondence exchanged between the [estate] and [the insurer], the [estate] was foregoing a defense from [the insurer]." *Id.* ¶ 26 (alterations, quotation marks, and citation omitted). Because the inquiry was "fact-driven" and required interpretation of "an ambiguous letter," summary judgment was inappropriate. *Id.* ¶ 26. "Thus, while actual notice presumptively triggers a duty to defend, a jury may nevertheless find, when warranted by the facts, that the insured knowingly declined a defense, and the duty to defend was therefore not breached." *Id.* ¶ 16 (internal quotation marks and citation omitted). With this as context, we turn to the insured's contractual obligation to give notice to the insurer.

**B.      The Duty of an Insured: The Obligation to Give Notice in the Context of the Duty to Defend**

**{15}**    The Trinity Policies each contain a notice provision, which requires the insured to notify the insurer "as soon as practicable" of an occurrence, claim, or suit, and the purpose of such a provision "is to enable the insurer to prepare to defend or make settlement as it sees fit." *State Farm Mut. Auto. Ins. Co. v. Found. Rsrv. Ins. Co.*, 1967-NMSC-197, ¶ 13, 78 N.M. 359, 431 P.2d 737. The principle is long-established that "[w]hen an insurance company seeks to avoid its obligations under a policy by claiming that the insured materially breached policy provisions, it must demonstrate substantial prejudice as a result of the breach." *Price*, 1984-NMCA-036, ¶ 30. Generally, "substantial prejudice and whether the insurance company and the insured acted fairly are . . . questions for a jury." *Id.*

**{16}**    In *Price*, this Court considered intertwined "issues concerning coverage, the duty of the insurance company to defend, and cooperation of the insured." *Id.* ¶ 1. The *Price* insured was involved in a car crash and notified his own insurer. *Id.* ¶¶ 2, 4. In the lawsuit that followed, the parties reached a settlement. *Id.* ¶ 9. The insurer was not a party and did not "participate in or consent to this settlement." *Id.* The insurer filed a declaratory judgment action against the insured, and the district court ruled that the insurer had no duty to defend the insured in the car-crash suit because the insured did not notify the insurer of the claim or demand a defense. *Id.* ¶¶ 10, 17. This Court reversed, holding that "[a] jury should decide whether there was a sufficient demand to defend and whether [the insurer] failed to defend" as well as "issues concerning [the insured]'s failure to cooperate, whether [the insurer] was prejudiced by [the insured]'s failure to cooperate, whether the settlement was made in good faith and whether it was reasonable in amount." *Id.* ¶ 51. Specifically, this Court determined that

> [t]here is evidence in the record to support an inference that [the insurer] knew a suit had been filed, or knew of facts which imposed a duty upon it to find out whether litigation involving its insured was pending, and that it consciously disregarded the facts and failed to defend its insured. The record also contains evidence which, if believed by a jury, supports [the

insurer]'s contention that [the insured] failed to cooperate, causing substantial prejudice to the insurer.

*Id.* ¶ 31. While our Supreme Court in *Garcia* broadened the acceptable form of notice of a claim from what *Price* required—from a demand by the insured to actual notice from any source—*Garcia* and *Price* uniformly determine that the "policy of encouraging insurers to perform their contractual obligations outweighs any requirement that allows insurers to default on their obligation to defend simply because the insured did not formally ask the insurer to do what the insurance contract already requires." *Garcia*, 2008-NMSC-018, ¶ 20 (internal quotation marks and citation omitted); *Price*, 1984-NMCA-036, ¶¶ 31-32, 51 (same).

**{17}** *Price* and *Dove* require that if disputed issues of fact exist regarding the insurer's breach of the duty to defend, the question must be submitted to the jury. *Price*, 1984-NMCA-036, ¶ 51. Where the duty to defend and the duty to give notice are both at issue, disputes of fact involving the duty to defend must be resolved as a threshold matter by the fact-finder, because notice-type defenses are unavailable to the insurer if the insurer breached the duty to defend. *See id.* ¶¶ 32-33, 53 (recommending the use of special verdict forms on the duty to defend issue); *Dove*, 2017-NMCA-051, ¶ 15 (outlining the peril of wrongfully denying the duty to defend). If the insurer is determined to have "unjustifiably fail[ed] to defend," the insurer "suffers serious consequences" and "becomes liable for a judgment entered against the insured and for any settlement entered into by the insured in good faith." *Price*, 1984-NMCA-036, ¶¶ 32-33. If, however, the fact-finder finds no breach of the duty to defend, the insurer may argue notice as a defense—that the insured breached the contract by failing to give the insurer timely notice and that the breach substantially prejudiced the insurer—to any remaining claims raised by the insured that are not contingent on the duty to defend findings. *Id.* ¶ 30; *see also State Farm Mut. Auto. Ins. Co. v. Fennema*, 2005-NMSC-010, ¶ 17, 137 N.M. 275, 110 P.3d 491 (holding that the insurer must demonstrate substantial prejudice resulting from an insured's breach of a consent to settle provision). Regardless, an insurer is not defenseless when facing allegations that it has breached the duty to defend. The insurer may assert that the claim is not arguably covered by the policy, the insurer did not receive actual notice of the claim, the insurer conducted a reasonable investigation, or that the insured declined a defense. *Garcia*, 2008-NMSC-018, ¶¶ 16, 19; *Dove*, 2017-NMCA-051, ¶ 11.

## C.      The Impact of the Duty to Defend on the Present Case

**{18}** We return now from the abstract to the present case, which like *Price*, involves the duty to defend and the duty to notify, and like *Price* and *Dove*, the possibility that the insurer, Trinity, waived some defenses if it breached the duty to defend. And, as in *Price* and *Garcia*, we conclude that because factual disputes remain regarding the duty to defend, we must reverse the grant of summary judgment on Trinity's Notice Motion. The district court granted the Notice Motion despite its determination that factual issues remained regarding the duty to defend. Pursuant to *Price*, however, any breach by Horton of the insurance contract's requirement to give notice or to cooperate would be

defenses lost to Trinity in the event that Trinity breached the duty to defend. *See Price*, 1984-NMCA-036, ¶¶ 31-33. That is not to say, however, that Trinity may not use Horton's pre-denial conduct to demonstrate that the duty to defend was not breached at all. *See Garcia*, 2008-NMSC-018, ¶¶ 16, 26 (considering to be a question of fact whether ambiguous evidence demonstrated that the insured knowingly declined a defense such that the insurer overcame the presumption that the duty to defend was triggered by actual notice). As a result, the district court's determination that disputed facts exist about Trinity's breach of the duty to defend precluded summary judgment on the Notice Motion.

{19}     Trinity maintains that prioritizing the insurer's duty to defend over the insured's contractual obligation to give notice is contrary to *Roberts Oil, Inc. v. Transamerica Ins. Co.*, 1992-NMSC-032, 113 N.M. 745, 833 P.2d 222. In *Roberts Oil*, our Supreme Court reaffirmed that an insurer must show "substantial prejudice" resulting from an insured's "substantial and material breach" of the insurance contract in order to be excused from performing its duties to defend and indemnify. *Id.* ¶¶ 19, 22. We do not disagree with this principle—we disagree with the timing of its application. As explained in *Price* and *Dove*, if the insurance company fails to defend after a demand, it "loses the right to claim that the insured breached policy provisions." 1984-NMCA-036, ¶ 33; *see Dove*, 2017-NMCA-051, ¶ 14. Thus, if the duty to defend was triggered, that issue must be resolved before the defense that the insured breached the policy comes into play.

{20}     To clear this hurdle Trinity argues that the district court's final order on the Notice Motion was correct because the duty to defend was not triggered. Trinity maintains that the duty to defend was not triggered because Horton's breach of the contractual notice obligation happened first in time and it is only "[a]*fter* an insurer declines to defend, [that] it 'loses the right' to point to *post-denial* actions by the insured that would otherwise be a breach of policy conditions." As we have explained, however, New Mexico law requires that the duty to defend question be resolved before contract defenses (like compliance with contractual notice requirements) can be applied—even though the insured's actions in delaying notice happened before the insured has an opportunity to defend. The resulting chronological disconnect is resolved by the insurer's ability to argue in the context of the duty to defend that the insurer did not receive actual notice or the insured's actions demonstrated that the insured intended to decline a defense. *See Garcia*, 2008-NMSC-018, ¶ 1. If the insurer never received actual notice from any source that is "sufficient to permit the insurer to locate and defend its insured," the insurer did not breach the duty to defend. *See id.* ¶ 25 (internal quotation marks and citation omitted). If the insured is found to have declined a defense by its actions before a defense is denied, there is no breach of the duty to defend. *See id.* ¶¶ 1, 26. We therefore need not strictly limit the analysis to the timing of the parties' actions, but instead leave for the fact-finder to consider the reasonable inferences to be gleaned from those actions in the context of the duty to defend. *See id.* ¶ 26; *Price*, 1984-NMCA-036, ¶ 31.

{21}     Trinity also contends that the duty to defend was not triggered because notice under the Trinity Policies was a condition precedent to Trinity performing its contractual

duties—including providing a defense. A condition precedent, however, "is generally understood as an event occurring after the formation of a valid contract, an event that must occur before there is a right to an immediate performance, before there is breach of a contractual duty, and before the usual judicial remedies are available." *Rodriguez v. Sanchez*, 2023-NMCA-076, ¶ 10, 536 P.3d 543 (alteration, internal quotation marks, and citation omitted). If "a contract contains a condition precedent to performance, the right to enforce the contract does not arise until the condition precedent has been fulfilled." *Id.* ¶ 12. Other jurisdictions have held as Trinity argues, that notice is a condition precedent to coverage. *See Philadelphia Indem. Ins. Co. v. Genesee Valley Improvement Corp.*, 834 N.Y.S.2d 802, 803-04 (App. Div. 2007); *E&L Chipping Co. v. Hanover Ins. Co.*, 962 S.W.2d 272, 278 (Tex. App. 1998). A dispute of authority remains, *see generally* 14A Jordan R. Plitt et al., *Couch on Insurance*, § 202:13, Westlaw (database updated Nov. 2023), however, and New Mexico has rejected the view that the failure of a party to an insurance contract to perform a condition excuses the other party from performance as a matter of law. *See Roberts Oil*, 1992-NMSC-032, ¶ 33. As to this issue, we must adhere to our Supreme Court's view.

**{22}** Our Supreme Court characterizes insurance contracts as "aleatory," meaning that "one or both parties' performance is conditional on the happening of a fortuitous event." *Jackson Nat'l Life Ins. Co. v. Receconi*, 1992-NMSC-019, ¶ 21, 113 N.M. 403, 827 P.2d 118. A key aspect of an aleatory contract is that the promise of each party "is not given in exchange for the prospect of performance of the other party's promise, and actual or prospective nonperformance by one party to the contract does not discharge the other." *Id.* In *Jackson*, the policy included an "express condition" that the insured's "health remain, at the time of delivery of the policy, as represented in the application." *Id.* ¶ 20. Because of the aleatory nature of the contract, however, the insured's failure to perform the promise—to notify the insurer if his health changed before delivery of the policy—did not discharge the insurer from performing "its aleatory promise to pay [the insured]'s beneficiary the face amount of the policy in the event of his death." *Id.* ¶ 21; *see also Roberts Oil*, 1992-NMSC-032, ¶ 33 (explaining that "[t]he agreed exchange was [the insured's] payment of the premium for which it received [the insurer's] promise to defend and indemnify it if the insured risk materialized"). Certain additional promises can be converted into conditions precedent, if performance of the promise "is made an express condition to performance of the insurer's promise." *Roberts Oil*, 1992-NMSC-032, ¶ 34. In *Roberts*, an insurer contended that it could "escape liability" because the insured breached a contract provision and argued that the breached provision was a material condition precedent because the contract contained a "no action" clause, which expressly precluded an action against the insurer unless there was full compliance with the terms of the policy. *Id.* ¶¶ 9, 19, 34. For purposes of that case, our Supreme Court was "willing" to accept "the insurers' argument that the no action clause does indeed convert the voluntary payment clause from a promise by the insured to an express condition to the insurer's obligations." *Id.* ¶ 34. Trinity similarly argues that the notice provision is such a condition, because the Trinity Policies contain "no action" clauses, which state that no party may bring an action against Trinity if all conditions are not performed, and Horton's failure to perform is therefore a condition precedent to triggering Trinity's duty to defend. As we have explained, however, the duty to defend is

triggered by notice "from any source sufficient to permit the insurer to locate and defend the insured." *Garcia*, 2008-NMSC-018, ¶ 25 (internal quotation marks and citation omitted). The duty to defend is therefore triggered even without the insured's compliance with the notice provision. As a result, because any actual notice is sufficient to trigger the duty to defend, in the present case, the "no action" clause cannot convert the notice provision into a condition precedent to the duty to defend. *See Roberts Oil, Co.*, 1992-NMSC-032, ¶ 34.

**{23}** For its part, Horton maintains on appeal that the district court should have granted summary judgment in its favor on the DTD Motion. Trinity responds that the district court properly denied summary judgment on the duty to defend because Horton was not arguably covered under the policy. This creates an unusual posture for our review. The denial of summary judgment to Horton—based on disputed issues of fact—is not final and generally not reviewable. *See Jones v. City of Albuquerque Police Dep't*, 2020-NMSC-013, ¶ 23, 470 P.3d 252 (noting that an order denying summary judgment is interlocutory, not final, and "generally not immediately appealable"). As we have noted, Trinity filed no cross-motion in the district court on the duty to defend, and the district court had no opportunity to grant such a motion. Thus, the question of factual disputes on the duty to defend, which the district court decided warranted a trial, is out of our reach on appeal.[1]

**{24}** If the jury finds Trinity breached the duty to defend, Trinity "suffers serious consequences," including the "loss of the right to claim that the insured breached the policy provisions . . . and the right to claim that the insured did not cooperate." *See Price*, 1984-NMCA-036, ¶¶ 32-33. In that scenario, any breach of the contractual notice requirement becomes irrelevant. If, however, the jury finds that Trinity did not breach the duty to defend, Trinity's notice defense would become relevant to any other claims Horton may have that are separate from the duty to defend. On appeal, Horton argues that its claims were not limited to those "as an insured," but also included judgment-creditor claims relating to the Vinyard Judgment—the arbitration award that Horton obtained against Vinyard. Trinity responds that Horton failed to preserve the question of whether the grant of the duty to defend motion resolved all of the pending claims, and

---

[1]We note that the district court's order partially granting Trinity's Umbrella Motion for summary judgment determined that Horton was not covered as an additional insured under the Umbrella Policy. It is not clear whether the district court denied Horton's DTD Motion because Horton was not covered by the Umbrella Policy and there was therefore no duty to defend, or whether the district court simply granted the Umbrella Motion that there was no coverage without any corresponding intent to rule on the duty to defend under the Umbrella Policy. The former ruling would be reversible, because the duty to defend can exist even in light of a subsequent determination of no coverage, *see Price*, 1984-NMCA-036, ¶¶ 16-17 (affirming a directed verdict of no coverage but separately considering the duty to defend), and the coverage inquiry for the duty to defend is whether the insured was arguably or potentially covered. *Dove*, 2017-NMCA-051, ¶ 16. The latter ruling would stand, for the same reason—there may ultimately be no coverage even if there was a duty to defend at the time the insurer received notice. We presume the ruling simply determined that the Umbrella Policy did not cover Horton as an additional insured. *See Bounds v. Hamlett*, 2011-NMCA-078, ¶ 32, 150 N.M. 389, 258 P.3d 1181 ("Generally, district court judgments are presumptively correct."). We therefore do not reverse the grant of summary judgment on coverage under the Umbrella Policy and do not disturb the district court's ruling that questions of fact precluded summary judgment on the duty to defend.

alternatively argues that judgment on all claims was appropriate based on Horton's failure to give notice and the nature of the Vinyard Judgment. We conclude that Horton's argument was sufficiently preserved—the district court denied both parties' separate summary judgment motions related to the Vinyard Judgment, which indicates disputes of material fact on the subject. In dismissing Horton's complaint completely, the district court relied on its finding that "as a matter of law, Horton's delay over a period of years in giving notice to [Trinity] of homeowner claims while engaging in litigation and/or arbitration proceedings and settling with homeowners or otherwise resolving claims created substantial prejudice to them" and that the "delay relieved defendants of both the duty to defend and the duty to indemnify." Thus, the district court determined that summary judgment on the notice question also resolved the Vinyard Judgment, despite disputed questions of fact on the substance of the claim. Because claims unrelated to the duty to defend and the Vinyard judgment claim could survive a fact-finder's determination that Trinity did not breach the duty to defend, we consider Horton's argument that summary judgment on the Notice Motion was inappropriate because the parties disputed material facts related to prejudice.

**{25}**    Horton presented evidence that notice was timely for the homeowner claims that were added after Acadia's 2014 notice to Trinity, the post-2014 homeowner claims were not the same as the earlier homeowner claims, and the consolidated arbitrator's findings did not predetermine later cases. Trinity responds that (1) Horton's intentional failure to tender a defense earlier was inherently prejudicial; and (2) Trinity was excluded from any control over or strategy regarding the initial homeowner arbitrations, bound by the arbitrators' findings on the homeowner claims such that "Horton's negligence could no longer be contested," and would have been able to do nothing more than pay fees and judgments. From the evidence presented on summary judgment, a reasonable fact-finder could conclude either that Trinity was prejudiced by the inability to participate in the early proceedings to shape and direct strategy and avoid preclusive findings, as Trinity maintains, or that as Horton argues, the ongoing future homeowner proceedings were not predetermined by the results from the consolidated arbitrations, and Trinity was not prejudiced. *See Price*, 1984-NMCA-036, ¶ 51 (recognizing the "jury issues" regarding the insured's cooperation). As a result, the district court's grant of summary judgment on notice must be reversed on this basis as well.

### D.    The Parties' Remaining Summary Judgment Arguments

**{26}**    Horton also challenges the district court's denial of summary judgment related to Amtrust's joinder. The district court denied cross-motions on this issue based on disputed questions of fact. We need not address this issue because we remand for further proceedings as a result of our ruling on the Notice Motion. On remand, it is for the fact-finder to resolve these remaining issues of disputed material fact.

### II.    We Affirm the District Court's Discovery Rulings

**{27}**    Because we remand for further proceedings, we address Horton's challenges to the district court's discovery rulings that occurred close in time to the grant of summary

judgment. Horton contends that the district court improperly (1) compelled Horton to reveal privileged communications regarding Horton's reasoning for allegedly delaying a request for Trinity to defend (the Tender Communications); and (2) refused to compel Trinity to reveal information regarding the "claims investigation" conducted by Trinity's outside counsel (the OC Documents). We review discovery rulings for abuse of discretion and "[t]o the extent a discretionary decision is premised on a construction of a privilege, it presents a question of law, subject to de novo review." *See Pina v. Espinoza*, 2001-NMCA-055, ¶ 12, 130 N.M. 661, 29 P.3d 1062.

**{28}** "A client may claim attorney-client privilege to refuse to disclose confidential communications between certain persons if the communications were made for the purpose of acquiring legal advice for the client." *Santa Fe Pac. Gold Corp. v. United Nuclear Corp.*, 2007-NMCA-133, ¶ 13, 143 N.M. 215, 175 P.3d 309 (citing Rule 11-503(B) NMRA). Attorney-client privilege has four elements: "(1) a communication (2) made in confidence (3) between privileged persons (4) for the purpose of facilitating the attorney's rendition of professional legal services to the client." *Id.* ¶ 14. The party claiming the privilege has the burden to establish "a communication is protected as an exception to the ordinary rule" that "the public has a right to every man's evidence." *Id.* ¶ 13 (internal quotation marks and citation omitted). With these principles in mind, we consider the Tender Communications followed by the OC Documents.

## A. Horton Did Not Carry Its Burden to Demonstrate That the Tender Communications Were Privileged

**{29}** In order to investigate Horton's motives for waiting to request a defense from Trinity, Trinity sought discovery and eventually filed a motion to compel. The district court granted Trinity's motion, and on appeal, Horton argues that the district court improperly compelled production because (1) Trinity's request was insufficiently specific; (2) the requested information was not relevant; (3) the information was privileged legal—and not business—advice; and (4) Horton did not waive the privilege. Because we conclude that Horton did not meet the burden to establish that the documents were privileged, we do not address waiver.

**{30}** We disagree with Horton's first contention that Trinity's motion did not "identif[y] the request at issue or the specific documents sought" and did not attach the discovery request in contention as required by Rule 1-037 NMRA. *See Albuquerque J. v. Bd. of Educ. of Albuquerque Pub. Schs.*, 2019-NMCA-012, ¶ 15, 436 P.3d 1 ("An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." (internal quotation marks and citation omitted)). Trinity attached the requests for production to the motion, as well as portions of Horton's privilege log, and sought to compel Horton to produce a witness to answer questions "that relate[] discretely to the tender of defense issues." The district court noted that Trinity's requests were "very broad" and exercised its discretion to narrow and specify the information sought because some of the documents "may be legitimate privileges as asserted." Because the district court narrowed the request, Horton demonstrates no prejudice from any failure by Trinity to sufficiently identify the

requested information in the motion to compel, and the district court did not abuse its discretion in compelling production. *See Doe v. Roman Cath. Diocese of Boise, Inc.*, 1996-NMCA-057, ¶ 21, 121 N.M. 738, 918 P.2d 17 (explaining that Rule 1-026(C) NMRA "invests the trial court with the authority to reasonably limit discovery; therefore, it is incumbent upon [the objecting party] to demonstrate that the limitation constituted an abuse of discretion so as to prejudice [the party's] case").

**{31}**  As to Horton's second contention, that the Tender Communications are not relevant to the subject matter of the case, we have already determined that disputed material facts prevented summary judgment on Trinity's defense based on Horton's alleged breach of the duty to provide notice and Horton's claim for breach of the duty to defend, including whether Horton by its actions declined a defense. Thus, even though the fact-finder might determine that Trinity breached the duty to defend, which would put the notice defense out of Trinity's reach, the information "appears reasonably calculated to lead to the discovery of admissible evidence" and therefore falls within the "scope of discovery"—provided that the information is "not privileged." *See* Rule 1-026(B)(1).

**{32}**  Turning to privilege, Horton's arguments relate to two types of Tender Communications: those between Horton's in-house counsel and outside counsel (Counsel Communications) and those between outside counsel and other entities (Entity Communications). Horton's argument regarding Counsel Communications relates to *Bhandari v. Artesia General Hospital*, in which we explained that "[t]he privilege protects communications generated or received by an attorney giving legal advice but does not protect communications derived from an attorney giving business advice or acting in some other capacity." 2014-NMCA-018, ¶ 12, 317 P.3d 856 (internal quotation marks and citation omitted). Horton points to evidence that the Counsel Communications were solely legal. Horton, however, also produced an affidavit from in-house counsel stating that "the decisions regarding the tenders of the defense of the Underlying Litigations and Arbitrations were a combination of business and legal considerations, and the business considerations were integrally intertwined with the legal considerations and therefore cannot be discussed without disclosing attorney-client privileged information." Horton argues that any legal purpose should shield the communication, but *Bhandari* forecloses that approach.

**{33}**  This Court in *Bhandari* concluded that "a court faced with a situation where the primary purpose of a communication is not clearly legal or business advice should conclude the communication is for a business purpose, unless evidence clearly shows that the legal purpose outweighs the business purpose." *Id.* ¶ 18. The evidence presented established an admittedly mixed purpose. Horton points to no evidence to demonstrate that the legal purpose "clearly" outweighs the business purpose. The district court applied the correct legal standard to decide the privilege question, and the evidence presented supported the district court's conclusion that Horton did not meet the burden to establish the privilege. Under these circumstances, we discern no abuse of discretion. *See id.* ¶ 9 (reviewing de novo whether the appropriate standard for privilege was applied and concluding that the evidence supported the district court's determination as to whether the communications were business or legal advice).

**{34}** Horton additionally argues that the Entity Communications were protected by the common interest privilege.[2] Attorney-client privilege "may be established by demonstrating that the communication occurred 'between the client or client's lawyer and another lawyer representing another in a matter of common interest.'" *Albuquerque J.*, 2019-NMCA-012, ¶ 19 (alteration omitted) (quoting Rule 11-503(B)(3)). Horton points to affidavits that it argues demonstrate an agreement between Horton, Acadia, and BITCO regarding "a cooperative and common enterprise towards an identical legal strategy" for the homeowner claims. The party asserting the common interest privilege, however, must establish a factual basis for two additional elements, in addition to an agreement. *Id.* Assuming that Horton's affidavits establish a preexisting or contemporaneous agreement of the parties, Horton does not demonstrate that the agreement reflected a "shared identical legal interest" or that the protected communications were each "made during the course of a joint defense effort between the resisting party and the third party and in furtherance of that effort." *See id.* (internal quotation marks and citation omitted). As a result, Horton did not meet "the burden of proving all elements of the privilege as to each communication claimed to be privileged." *See id.*

## B. Horton Did Not Meet the Burden to Compel Production of the OC Documents

**{35}** Last, Horton argues that the district court should have compelled Trinity to identify the documents that Trinity sent to outside counsel in order to facilitate investigation of Acadia's 2014 notice of claim and to produce unredacted communications between Trinity's adjustors and outside counsel. Horton does not appear to contend the OC Documents were not privileged. As a result, Horton once again bore the burden to show that either the documents should have been compelled or the communications unredacted. *See Santa Fe Pac. Gold Corp.*, 2007-NMCA-133, ¶ 25 (placing the burden on the party seeking the documents after a prima facie case for privilege is made).

**{36}** As to the request to identify documents, Trinity notes that it had no list of the documents that were provided to outside counsel and the entire claims file was produced to Horton. In reply, Horton asserted that the district court should have compelled Trinity to "confirm" outside counsel's testimony that he delivered his file to Trinity. We see no prejudice, and therefore no abuse of discretion, in the district court's denial of Horton's motion to "confirm" outside counsel's testimony about which documents were reviewed. *See Doe*, 1996-NMCA-057, ¶ 21.

**{37}** As to the redaction of documents, Horton argues that (1) any privilege associated with the communications between Trinity's adjustors and outside counsel was waived because Trinity seeks to rely in good faith on outside counsel's advice; (2) attorney-

---

2Horton refers also to the work product doctrine and the mediation privilege—two separate protections from discovery with separate analyses and controlling facts. We decline to address either as these protections are raised in two sentences without application of the cited law, Rule 11-503(B)(3) and NMSA 1978, Section 44-7B-4 (2007), to the facts of the present case.

client privilege does not shield communications that are relevant to the insurer's bad faith; and (3) Horton nevertheless has "substantial need" for the material. Trinity, however, has stipulated that it does not intend to assert a reliance-on-counsel defense and instead points to retaining counsel only as a step performed to investigate. Horton contends that this distinction makes no difference, but because Trinity does not intend to justify its decision not to defend by relying on counsel's advice, Trinity has not waived the privilege in this respect. *See Pub. Serv. Co. of N.M. v. Lyons*, 2000-NMCA-077, ¶ 23, 129 N.M. 487, 10 P.3d 166 (requiring "offensive or direct use of privileged materials before the party will be deemed to have waived its attorney-client privileges"). We are further unpersuaded by the out-of-state authority that Horton cites for the proposition that attorney-client privilege should not prevent discovery in bad faith cases. *See, e.g.*, *Boone v. Vanliner Ins. Co.*, 744 N.E.2d 154, 211-12 (Ohio 2001) ("The issue before us is whether, in an action alleging bad faith denial of insurance coverage, the insured is entitled to obtain, through discovery, claims file documents containing attorney-client communications and work product that may cast light on whether the denial was made in bad faith."). An insurer's good faith beliefs regarding coverage have no bearing on the duty to defend analysis. *See Dove*, 2017-NMCA-051, ¶ 13 (explaining that "a good faith belief" that the insured is not covered "is not a defense to the breach of the duty to defend" (internal quotation marks and citation omitted)). We conversely cannot justify invading the privilege when evidence of the insurer's good or bad faith is not at issue. And truly last, Horton's reference to a "substantial need" invokes an exception to the work product doctrine and not attorney-client privilege—the two are distinct and separate. *See Santa Fe Pac. Gold Corp.*, 2007-NMCA-133, ¶ 38. Horton has not contested that the OC Documents are privileged and therefore, we need not consider the separate work product doctrine and its exceptions.

{38}    Under the facts of the present case and based on the arguments raised on appeal, we cannot conclude that the district court abused its discretion by denying Horton's motion to compel the OC Documents.

**CONCLUSION**

{39}    For the reasons stated herein, we affirm in part, reverse in part, and remand for further proceedings.

{40}    **IT IS SO ORDERED.**

**KATHERINE A. WRAY, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**GERALD E. BACA, Judge**